[Crim. No. 496. Third Appellate District.—May 3, 1920.]

THE PEOPLE, Respondent, v. DAN NUNES, Appellant.

[1] CRIMINAL LAW—MAYHEM—PREMEDITATED INTENT—EVIDENCE.—In a prosecution for the crime of mayhem, it is not necessary affirmatively to show a deliberate or premeditated intent to commit the crime in order to sustain the charge, notwithstanding the word "maliciously" as used in section 203 of the Penal Code, in which that crime is defined, might imply otherwise.

[2] ID.—UNLAWFUL STRIKING OF ANOTHER—RESULTANT LOSS OR DISFIGUREMENT.—If a person unlawfully strikes another, not with the specific intent to commit the crime of mayhem, and the blow so delivered results in the loss or disfigurement of a member of the body of the assaulted party or in putting out his eye, the crime is nevertheless mayhem.

---

1. Malice and premeditation as element of offense of mayhem, note, L. R. A. 1916E, 494.

2. What constitutes mayhem, note, 65 Am. St. Rep. 771.

[3] ID.—DISFIGUREMENT OF EYE — EVIDENCE — FINDING.—While under the statute the mere disfigurement of an eye would not amount to mayhem unless such disfigurement resulted in rendering the eye useless, in this prosecution the jury were warranted in finding, as their verdict implies they did find, that the defendant by the blow he delivered in and upon the face of the prosecuting witness "put out" the eye of the latter.

[4] ID.—"PUT OUT THE EYE"—MEANING OF EXPRESSION.—The expression or phrase "put out the eye," contained in section 203 of the Penal Code, means that the eye has been injured to such an extent that its possessor cannot use it for the ordinary and usual practical purposes of life.

[5] ID.—EFFECT OF TESTIMONY GIVEN ON CROSS-EXAMINATION—PROVINCE OF JURY.—In a prosecution for the crime of mayhem, if the direct testimony of the doctor who treated the prosecuting witness after the injury was inflicted upon the latter's eye is sufficient to sustain a verdict of guilty, but there are statements brought out on his cross-examination which are calculated to weaken his direct testimony in its tendency to show that the eye of the prosecuting witness was put out, it is for the jury to consider and determine what weight they should give his direct testimony when considered by the light of statements made on his cross-examination.

[6] ID.—BURDEN OF PROOF—SUFFICIENCY OF INSTRUCTIONS.—In a prosecution for the crime of mayhem, it is not error to refuse to read to the jury a requested instruction that they must find from the evidence that the defendant put out the eye of the complaining witness or they must acquit him, where the court, after stating to the jury in detail the contents of the information and reading to them section 203 of the Penal Code, upon which the information is based, tells them that, to justify a verdict of guilty, it rested upon the prosecution to prove beyond all reasonable doubt that "said defendant is guilty of the crime charged against him in the information."

APPEAL from a judgment of the Superior Court of Sacramento County and from an order denying a new trial. Malcolm C. Glenn, Judge. Affirmed.

The facts are stated in the opinion of the court.

J. M. Inman for Appellant.

U. S. Webb, Attorney-General, and J. Chas. Jones, Deputy Attorney-General, for Respondent.

3. Mayhem as dependent on part of body injured and extent of injury, note, 16 A. L. R. 955.

HART, J.—Defendant was informed against by the dis-. trict attorney of the county of Sacramento for the crime of mayhem. Upon a trial he was found guilty and he prosecutes this appeal from the judgment of conviction and from an order denying his motion for a new trial.

Louis Dulmaine, the prosecuting witness, was engaged as a bartender in a building at the corner of Seventh and L Streets, in the city of Sacramento, his hours of duty being from 5 o'clock P. M. until closing time the next morning. He was so engaged on the night of June 29, 1919, closed his saloon at 2 o'clock on the morning of June 30th, and, about half an hour later, he and two other men started walking up Seventh Street toward K. Before reaching K Street they met the defendant, accompanied by a woman, approaching them. According to the testimony of the prosecution, at about that time one of Dulmaine's companions was inviting the other members of the party to his house to partake of a chicken dinner. Defendant said: "What's that? What the hell's that about chicken?" and used some vulgar language. Dulmaine turned around and wanted to know "what was the matter with that guy," and asked: "What's it to you?" or words to that effect, upon which defendant struck Dulmaine in his right eye. He was wearing glasses at the time and the result of the blow was that they were broken and a piece of glass entered the eyeball, the prosecution claiming that thereby the sight of his right eye was destroyed.

Section 203 of the Penal Code defines mayhem as follows: "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem."

[1] It has been held that it is not necessary affirmatively to show a deliberate or premeditated intent to commit the crime of mayhem in order to sustain that charge, notwithstanding that the word "maliciously" as used in section 203 might imply otherwise. In *People* v. *Wright,* 93 Cal. 564, [29 Pac. 240], it is said: " . . . It therefore follows that as malice aforethought is not an essential element in the crime of mayhem, proof of premeditation or deliberation is not required. But the requirements of the statutes in such

cases will be fully met by proof of the commission of the act, from which the law will presume, though it be done in pursuance of an intent formed during the conflict, that it was done unlawfully and maliciously—that is, 'with a wish to . . . injure another person, or an intent to do a wrongful act'—unless the evidence tends to show to the contrary." In other words, it is held in that case that it is sufficient to prove only the commission of the act, from which the law will presume that it was done unlawfully and maliciously, unless the evidence tends to show that it was done under circumstances constituting self-defense.

[2] If a person unlawfully strikes another, not with the specific intent to commit the crime of mayhem, and the blow so delivered results in the loss or disfigurement of a member of the body of the assaulted party or in putting out his eye, the crime is nevertheless mayhem. (See *Terrell* v. *State,* 86 Tenn. 523, [8 S. W. 212]; *Worley* v. *State,* 11 Humph. (Tenn.) 172, 175.)

The appellant, however, does not seem to question the law as it is above stated, but his main contention is that the evidence fails to show that the defendant did "put out the eye" of the prosecuting witness within the meaning of section 203 in that particular. It is further contended that the court erred to the prejudice of the defendant by refusing to give one of his requested instructions.

[3] We agree with counsel for the defendant that under the statute the mere disfigurement of an eye would not amount to mayhem unless such disfigurement resulted in rendering the eye useless; but we think the jury were warranted in finding, as their verdict implies that they did find, that the defendant by the blow he delivered in and upon the face of the prosecuting witness "put out" the eye of the latter.

Dr. Briggs, a noted oculist, examined and treated the eye of the complaining witness after the injury was inflicted upon the latter's eye by the defendant. He testified on direct examination as follows:

"Mr. Russell: Q. Do you know Mr. Louis Dulmaine, the gentleman back here? A. I do. Q. You have had occasion to treat him? A. I have. Q. For what sort of trouble was that, Doctor? A. He came in on the second day of July, last, with an injured eye, that had been injured, he said, I

think, two or three days previously. There was a penetrating wound of the cornea, penetrating the iris, and a punctured lense; the lense of the eye was punctured, causing cataract; causing the lense to become opaque, which we call cataract. Q. Did you treat the eye? A. I did. Q. What is the condition of the eye in reference to sight? A. The eye is practically blind. He sees light; that is all. He doesn't see objects. Q. The sight, then, is what we call destroyed? A. He is practically blind. Q. He is practically blind in that eye? A. Yes, sir. Q. All that he can distinguish is just light? A. Yes, sir. I think he can—he sees motions that are made past the eye. Q. Is that a permanent injury, Doctor? A. Yes. Q. That is an injury such as can not be cured? A. Well, yes; I can say that his chances of ever seeing any more are almost nil. Q. Now, you say there was a sort of a wound in that eye? A. A puncturing wound, yes; about, I think, a sixth of an inch long, that went through the clear part of the eye. Q. Could you tell from the nature of the wound what that might be caused by, Doctor? A. Well it might be caused by any sharp thing projected against the eye. It might have been a knife wound, a glass wound, or anything else that struck the eye with force enough to cause that kind of injury. It was more like a cut than a bruise. It was a 'clean-cut wound. Q. That would indicate that force had been used on it? A. Oh, yes.''

There can be no manner of doubt that the foregoing testimony, taken alone, unmistakably shows that the complaining witness' eye was put out. If all that the injured party could do with the eye was, as the doctor testified, merely to distinguish lightness from darkness or perceive a motion or movement of some sort made immediately before the eye, the eye was certainly rendered perfectly useless to its possessor. If both eyes were so afflicted, it is very clear that the complaining witness would practically be blind. [4] What the statute obviously means by the expression or phrase, "put out the eye," is that the eye has been injured to such an extent that its possessor cannot use it for the ordinary and usual practical purposes of life.

But counsel for the defendant, in his contention that the eye of the complaining witness was not shown to have been "put out," relies mainly upon the following testimony

brought out on the cross-examination of Dr. Briggs:
"Hardly a likelihood of his ever having any use of that eye
for visual purposes. . . . I wouldn't say it is impossible for
him to get some vision in it.  Possibly in a year or two years
it may improve; but I think the chances of doing so are so
slight that I don't know that it would be worth attempting.
Q. But, in your judgment and experience, you wouldn't say
that there isn't any chance?  A. Oh, no.  Q. In other
words, there is a chance?  A. There is a chance of getting
some sight, but so little chance of getting any useful sight
that I wouldn't consider it in human events at all possible—
I wouldn't say possible—at all probable. . . . I should say
he might have a chance in a hundred of getting some use-
ful sight, and I would say that was hardly a probability
either; and in the effort to get it, it might do a lot of harm.
So it would be a question in my mind whether I would ever
advise him to have an operation done with a view to im-
proving the sight; I don't know; I wouldn't say; I wouldn't
know, because I would have to see the eye at some other
time, in some other condition.  I might feel that in a year
or two years' time it might be advisable to do an operation
upon it.  I wouldn't say it wasn't possible, now, in the
course of human events; but I think it is improbable."

There is nothing in the foregoing testimony of Dr. Briggs
which would justify us in holding that the verdict is not
sufficiently supported.  The full purport or the effect of the
doctor's testimony upon cross-examination is that, while it
is not impossible that "in the course of human events" and
at the end of about two years an operation could be per-
formed upon the eye which might have the effect of restor-
ing to it some power of sight, still it was not probable that
thus such a result could be brought about.  Indeed, it would
seem to be very clear from the doctor's testimony as a whole
that he was at the time of the trial of the opinion that the
injury to the eye could not be so amended or corrected as
to enable the complaining witness to use it at any time in
the future for any useful or practical purpose whatever.
[5]  At all events, the direct testimony of the doctor amply
sustains the verdict, and if there were any statements
brought out on his cross-examination which were calculated
to weaken his direct testimony in its tendency to show that
the eye was put out, it was for the jury to consider and de-

termine what weight they should give his direct testimony when considered by the light of statements made on his cross-examination.

Our conclusion is, as above stated, that the verdict derives sufficient support from the evidence to uphold it.

The instruction referred to above as having been proposed by the defendant and disallowed by the court is this: "You are instructed that you must find from the evidence that the defendant, Dan Nunes, put out the eye of the complaining witness or you must acquit him."

[6] One of the grounds upon which the court refused to read the instruction to the jury was that the proposition therein stated was covered by the general charge of the court, and this we find to be substantially true. In its initial instruction the court stated to the jury in detail the contents of the information, thus telling them, as the statute describes it, the nature of the charge upon which the defendant was being tried, and then stated that the issue had been made by a plea of not guilty by the defendant to the information. The court also read to the jury section 203 of the Penal Code, upon which the information is based, and told the jury that, to justify a verdict of guilty, it rested upon the prosecution to prove beyond all reasonable doubt that "said defendant is guilty of the crime charged against him in the information." The accusatory pleading specifically charged the defendant with unlawfully and maliciously putting out the eye of the complaining witness. It would seem that the jury would certainly be minus that degree of intelligence which it must be assumed the average person usually summoned to jury duty possesses if it could be said, as a matter of law, that they did or could not understand from the initial instruction of the court that the defendant would be entitled to an acquittal unless it were shown beyond all reasonable doubt that he had put out the eye of the complaining witness. Indeed, the only question submitted to the jury was whether the defendant did put out the eye of the prosecuting witness; that was the single specific charge in the information; and when told in general language that the charge in the information was required to be established beyond all reasonable doubt to justify a conviction, that was tantamount to telling the jury that if the people failed to prove by the degree of proof mentioned that defendant put

out the eye of the complaining witness, the former would be
entitled to an acquittal.

There are no other points submitted here for considera-
tion.

The judgment and the order appealed from are affirmed.

Nicol, P. J., *pro tem.*, and Burnett, J., concurred.