[No. B077329. Second Dist., Div. Five. Aug. 3, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
VAIMOE SEKONA, Defendant and Appellant.

**COUNSEL**

Jennifer Mack, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, Geoerge Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, William T. Harter and William V. Ballough, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**TURNER, P. J.—**

## I. INTRODUCTION

Defendant, Vaimoe Sekona, appeals from his convictions of mayhem (Pen. Code, § 203)[1] and assault with great bodily injury and with a deadly weapon (§ 245, subd. (a)(1)); plus findings he used a deadly weapon (§ 12022, subd. (b)) and had previously been convicted of a serious felony. (§ 667, subd. (a).) Defendant contends the trial court committed reversible error in failing to instruct sua sponte that an honest but unreasonable belief

---

[1]All further statutory references are to the California Penal Code, unless otherwise noted.

in the need for self-defense negated the malice required for a mayhem conviction. We disagree and affirm the judgment.

## II. FACTS

On February 15, 1993, Viliami Koloamatangi attended a party at a friend's home where he met three younger women, Talena Loketi, Evalani Sekona, and Barbara Tenifa. Mr. Koloamatangi drank one 40-ounce beer at the party. Mr. Koloamatangi and the three women left the party and rode around in his uncle's car for a number of hours. At about 5 or 6 p.m., Mr. Koloamatangi drove to defendant's house because Ms. Loketi wanted to get some clothes that were in the residence. Mr. Koloamatangi parked the car across the street from defendant's home. Ms. Loketi and Ms. Sekona, who was defendant's cousin, got out of the car. Ms. Loketi and Ms. Sekona went into defendant's trailer which was located in the rear of a residence. About 15 minutes later, the 2 women returned to the car and told Mr. Koloamatangi that defendant wanted to talk to him. Mr. Koloamatangi had met defendant three weeks earlier at a luau but had not had any contact or problems with him since that time. Mr. Koloamatangi did not know why defendant wanted to speak with him. Mr. Koloamatangi, Ms. Loketi, and Ms. Sekona went to the back of the residence to talk to defendant. Ms. Sekona went into the house. Mr. Koloamatangi did not see anyone and decided to return to the car.

As Mr. Koloamatangi turned, defendant "popped out" from the right corner of the trailer holding a black 18-inch club in his left hand. Defendant also had a black revolver in his right hand. Defendant pointed the gun at Mr. Koloamatangi's forehead. Defendant asked Mr. Koloamatangi where his gun was located. Mr. Koloamatangi put his hands up and told defendant he had "nothing." He did not have a weapon with him or in his car. Mr. Koloamatangi told defendant that he was going to his car and then return home. When he turned to leave, defendant hit him in the forehead, three or four times. Mr. Koloamatangi fell down on the ground. He heard defendant and Ms. Loketi talking but could not understand what they were saying. Mr. Koloamatangi lay on his left side with his left arm on the ground. After about 15 seconds, defendant kicked Mr. Koloamatangi in the left eye. Defendant was wearing construction boots at the time. Mr. Koloamatangi blacked out for about 30 seconds. When he awoke, he could not see from his left eye. At the trial, Mr. Koloamatangi could not see out of his eye and had been advised by his physicians that he probably would not see from it again.

After Mr. Koloamatangi got enough energy, he walked to the Lennox sheriff's station about three blocks away because he could not see well enough to drive. Deputy Sheriff Donna Cheek observed Mr. Koloamatangi

as he entered the station. She subsequently spoke to Ms. Loketi, Ms. Sekona, and a third woman. When defendant was interviewed the following day, he stated he struck Mr. Koloamatangi twice in the face with a metal rod and kicked him in the face when he was on the ground. Defendant did not indicate anything occurred before he attacked him. Deputy Sheriff Gregg Lewison asked defendant whether Mr. Koloamatangi was armed. Defendant stated: Mr. Koloamatangi was not armed; Mr. Koloamatangi did not say anything to defendant; and Mr. Koloamatangi did not threaten defendant in any way. Defendant stated he was not afraid that Mr. Koloamatangi was "going to do some damage to him."

In support of the self-defense theory, defendant testified that he had beaten one of Mr. Koloamatangi's cousins earlier in the afternoon of February 15, 1993. According to defendant, he hit Mr. Koloamatangi's cousin "Nupo" in the jaw. The person referred to as "Nupo" was knocked to the ground. According to defendant, the person referred to as "Nupo" had said a profane word in front of Ms. Tenifa. When "Nupo" got to his knees, defendant grabbed him by the hair and hit him in the face.

Ms. Sekona testified that while she was driving around with Mr. Koloamatangi he told them that "he was going to get [defendant] one of these days" for beating up "Nupo." Prior to the attack during the evening hours of February 15, 1993, on Mr. Koloamatangi, Ms. Sekona had spoken to defendant. Outside, Mr. Koloamatangi was waiting in his uncle's car. She tearfully stated that Mr. Koloamatangi had talked about killing defendant in two weeks. Ms. Sekona told defendant that Mr. Koloamatangi " 'just wants to talk.' " She also said Mr. Koloamatangi was waiting for defendant. Defendant told her to tell Mr. Koloamatangi to get in the car and leave. When Ms. Sekona returned she was still crying. Defendant told her that "if he wanted to talk to me to come back here and talk to me." Ms. Sekona went back to the car to get Mr. Koloamatangi. Defendant was watching Mr. Koloamatangi standing by a gate. Mr. Koloamatangi did not appear to have a weapon. Defendant exited his trailer. Mr. Koloamatangi asked why "Nupo" had been beaten. Defendant did not reply but stuck a steel pole in Mr. Koloamatangi's neck. Defendant asked if he had a gun. Defendant admitted hitting Mr. Koloamatangi three or four times. Defendant further admitted he kicked Mr. Koloamatangi. This was after Mr. Koloamatangi indicated he would "just leave." According to defendant, he hit Mr. Koloamatangi because, as the victim turned to the left, Mr. Koloamatangi put his left hand down as if he was reaching for something. Defendant did not see a gun. Mr. Koloamatangi said he did not have a firearm. However, defendant believed Mr. Koloamatangi had a gun. Defendant had heard Mr. Koloamatangi carried a gun and had threatened other people. Defendant was

"afraid" because he thought Mr. Koloamatangi had come to retaliate for the beating of "Nupo." Defendant kicked Mr. Koloamatangi out of fear the victim would grab or run him down. Defendant, however, admitted that Mr. Koloamatangi never tried to hit him.

Defendant testified that the night he was arrested he told a deputy the reason he attacked Mr. Koloamatangi was because "my cousin told me that they were going to kill me in two weeks." Defendant contradicted Deputy Lewison's testimony. Defendant stated he told the deputy about the threat and why Mr. Koloamatangi was assaulted.

### III. DISCUSSION

■    Section 203 provides in part: "Every person who unlawfully and maliciously deprives a human being of a member of his body . . . or puts out an eye, . . . is guilty of mayhem." The term "maliciously" as it is applicable to mayhem, is defined as "a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law." (§ 7, subd. (4); *People v. Wright* (1892) 93 Cal. 564, 566 [29 P. 240].)

■    Relying primarily on the doctrine of imperfect self-defense as articulated in *People v. Flannel* (1979) 25 Cal.3d 668, 674-680 [160 Cal.Rptr. 84, 603 P.2d 1] and as applied to mayhem cases in the lead opinion in *People v. McKelvy* (1987) 194 Cal.App.3d 694, 704 [239 Cal.Rptr. 782], (lead opn. of Kline, P. J.), defendant argues the trial court committed reversible error in failing to instruct the jury sua sponte that an honest[2] but unreasonable belief in the need for self-defense negated the "malice" required for mayhem.[3] The Supreme Court explained the doctrine of imperfect self-defense in *People v. Flannel, supra,* 25 Cal.3d at page 679, as it related

---

[2]We refer to the requisite belief as an "actual" one in accordance with our Supreme Court's determination that the term "honest belief" is inherently confusing because one cannot have a "dishonest belief." (*In re Christian S.* (1994) 7 Cal.4th 768, 773 [30 Cal.Rptr.2d 33, 872 P.2d 574].)

[3]Before addressing defendant's contentions we note our Supreme Court recently rejected the People's argument that Proposition 8, the initiative measure adopted in June 1982, and the 1981 enactment of Senate Bill No. 54 (Stats. 1981, ch. 404, pp. 1591-1592) amending section 188 abolished the defense of imperfect self-defense. (*In re Christian S., supra,* 7 Cal.4th at pp. 773-783.) *In re Christian S.* involved a charge of second degree murder against a minor who killed Robert Elliott, a skinhead and possible gang member. Christian began carrying a handgun as a result of being physically and verbally harassed by the decedent's friends for about a year. On the day he was shot, the decedent chased Christian down the beach. The decedent threatened him and challenged Christian to fire the weapon. Christian eventually did fire the gun. Christian raised claims of self-defense (§ 197) and heat of passion or provocation. (§ 192, subd. (a).) He also argued the doctrine of imperfect self-defense negated malice, thereby reducing his offense to voluntary manslaughter. In rejecting, the argument the 1981 amendments to the Penal Code and Proposition 8 abolished the doctrine of imperfect

to murder, a specific intent crime, requiring proof of "malice aforethought" as follows: "It is the [actual] belief of imminent peril that negates malice in a case of complete self-defense; the reasonableness of the belief simply goes to the justification for the killing." The court then concluded trial judges had a sua sponte duty to instruct that an actual but unreasonable belief in the need to defend against imminent peril to life or great bodily injury negates the element of malice aforethought which is required for a murder conviction. (*Id.* at pp. 679, 683.) ▮ However, the doctrine of imperfect self-defense is narrow. (*In re Christian S., supra,* 7 Cal.4th at p. 783.) Our Supreme Court held: "It requires without exception that the defendant must have had an *actual* belief in the need for self-defense. . . . Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury." (*Ibid.,* original italics; see also *People v. De Leon* (1992) 10 Cal.App.4th 815, 824-825 [12 Cal.Rptr.2d 825]; *People v. Uriarte* (1990) 223 Cal.App.3d 192, 197 [272 Cal.Rptr. 693].)

In *People v. McKelvy, supra,* 194 Cal.App.3d at pages 701-704, the lead opinion applied *Flannel* to a mayhem case. The lead opinion declared that an actual but unreasonable belief in the need for self-defense negated the malice required for a conviction of mayhem, mitigating the crime to assault or battery. The lead opinion recognized the "malice" required for the crime of mayhem was different from the "malice aforethought" required in murder and as discussed in *Flannel.* However, the lead opinion concluded a *Flannel*-type instruction was required and should be given sua sponte in mayhem cases where there was more than minimal evidence of self-defense. The lead opinion stated: "Mayhem, unlike murder, is a general intent crime. [Citations.] No specific intent to maim or disfigure is required, the necessary intent being inferable from the types of injuries resulting from certain intentional acts; one who unlawfully strikes another without the specific intent to commit the crime of mayhem is still guilty of that crime if the blow results in the loss or disfigurement of a member of the body or putting out of

---

self-defense, our Supreme Court pointed out it had specifically left the question open in *People v. Saille* (1991) 54 Cal.3d 1103, 1111, footnote 4 [2 Cal.Rptr.2d 364, 820 P.2d 588], when it held the amendments and the proposition abolished diminished capacity. (*In re Christian S., supra,* 7 Cal.4th at pp. 779-780.) Our Supreme Court concluded neither the language, history, nor context of the amendments compelled the conclusion the Legislature intended to abrogate the doctrine of imperfect self-defense. (*Id.* at pp. 771, 773-783.) The court observed *People v. Flannel, supra,* 25 Cal.3d at pages 674-680, had two independent premises: (1) the notion of mental capacity set forth in *People v. Conley* (1966) 64 Cal.2d 310, 322 [49 Cal.Rptr. 815, 411 P.2d 911]; and (2) a grounding in both well-developed common law and in the statutory requirement of malice aforethought. Because of the 1981 amendments eliminating the notion of diminished capacity, the part of reasoning in *Flannel* was no longer valid. However, our Supreme Court concluded, "*Flannel's* other premise was not affected by the amendments." (*In re Christian, supra,* 7 Cal.4th at p. 777.)

the eye of the victim. [Citations.] Nevertheless, the inclusion of the word 'maliciously' in the definition of mayhem clearly requires proof of something more than that the act was done intentionally, wilfully or knowingly. [Citation.] According to [the widely accepted definition from Perkins & Boyce, Criminal Law (3d ed. 1982) page 860], 'malice in the legal sense imports (1) the absence of all elements of justification, excuse or recognized mitigation, and (2) the presence of either (a) an actual intent to cause the particular harm which is produced or harm of the same general nature, or (b) the wanton and wilful doing of an act with awareness of a plain and strong likelihood that such harm may result.' [Citations.] [¶] Although the 'malice' required for the offense of mayhem differs from the 'malice aforethought' with which *Flannel* was concerned, it is equally true in both cases that the requisite state of mind is inconsistent with a genuine belief in the need for self-defense. One who truly believes there is a need for self-defense cannot be said to act with intent to 'vex, injure or annoy' and may be found guilty of no more than an assault or battery." (*People* v. *McKelvy, supra*, 194 Cal.App.3d at p. 702, fn. omitted.) The lead opinion then concluded that in the future courts should sua sponte instruct that an actual but unreasonable belief in the necessity to defend oneself will negate the malice required for mayhem. No other justice agreed with the analysis in the lead opinion. **(2b)** Defendant contends, however, that by virtue of *Flannel* and the lead opinion in *McKelvy*, the trial court was required to sua sponte instruct that his actual but unreasonable belief to defend himself against Mr. Koloamatangi negated the "malice" which was necessary to convict him of the crime of mayhem. We disagree.

First, although it has been held "the rule of unreasonable self-defense clarified in *Flannel* is one of state common law" (*People* v. *Murtishaw* (1989) 48 Cal.3d 1001, 1014 [258 Cal.Rptr. 821, 773 P.2d 172]), there is no statute or Supreme Court case in which the issue of whether the malice required for mayhem is negated by an actual but unreasonable belief in the need to defend oneself was evaluated and adopted such that it is now an accepted general principle of law requiring a trial court to instruct the jury without a request. (*People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 126 [2 Cal.Rptr.2d 335, 820 P.2d 559], judgment vacated and cause remanded *sub nom. Bacigalupo* v. *California* (1992) __ U.S. __ [121 L.E.2d 5, 113 S.Ct. 32] affd. (1994) 6 Cal.4th 457 [24 Cal.Rptr.2d 808, 862 P.2d 808].) With respect to the general duty to instruct sua sponte, *Flannel*, stated: "[E]ven in the absence of a request, a trial court must instruct on the general principles of law governing the case, i.e., those principles relevant to the issues raised by the evidence, but need not instruct on specific points developed at trial. 'The most rational interpretation of the phrase "general principles of law governing the case" would seem to be those principles of

law *commonly* or closely and openly connected with the facts of the case before the court.' [Citations.]" (*People* v. *Flannel, supra,* 25 Cal.3d at pp. 680-681, fn. omitted, original italics.) ■ The duty to instruct sua sponte on defenses arises " 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 326 [185 Cal.Rptr. 436, 650 P.2d 311] quoting *People* v. *Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913], disapproved on another point in *People* v. *Flannel, supra,* 25 Cal.3d at pp. 684-685, fn. 12.) In *People* v. *Bacigalupo, supra,* 1 Cal.4th at page 126, our Supreme Court reiterated that the trial court's sua sponte duty was limited to general principles of law. ■ General principles of law do not include legal concepts that have been referred to "only infrequently" and with " 'inadequate elucidation' . . . ." (*Id.* at p. 126 citing *People* v. *Flannel, supra,* 25 Cal.3d at p. 681.) ■ Moreover, the principal authority upon which defendant relies, *People* v. *McKelvy, supra,* 194 Cal.App.3d at pages 698-707, is the sole reported intermediate appellate opinion on the issue. Also, it is only a lead opinion. No other justice, apart from the author of the lead opinion, has accepted its analysis. In *People* v. *Bacigalupo, supra,* 1 Cal.4th 103, at pages 126-127, footnote 4, our Supreme Court questioned whether an intermediate court's determination alone could give rise to a sua sponte duty for trial courts in future cases. The court held: "*Flannel* does not suggest that evaluation and acceptance of a legal rule in one intermediate appellate decision transforms it into a general principle of law." (*Ibid.*) Likewise, in this case, we cannot conclude that the existence of a lead appellate opinion, concurred in by no other justices, extending *Flannel*'s holding to the crime of mayhem has become a general principle of law. (*Ibid.*) Even if the *McKelvy* lead opinion correctly stated the law concerning the effect of an actual but unreasonable right to defend in a mayhem case, it would be unlikely a sua sponte duty to instruct would exist.

Second, *Flannel* did not hold that any crime in which "malice" was an element of the offense created a sua sponte duty to instruct on the so-called imperfect self-defense theory.[4] Since *Flannel* was decided, the Supreme Court has not held a trial judge had a sua sponte duty to instruct on the imperfect self-defense doctrine in any context other than murder.[5] The *McKelvy* lead opinion's and defendant's reliance on *Flannel* to support the

---

[4]Our Supreme Court rejected the argument an unreasonable belief that defendant is acting under duress will negate the requisite specific intent necessary for robbery based on *Flannel.* (*People* v. *Bacigalupo, supra,* 1 Cal.4th at p. 126.)

[5]An appellate court has concluded that a defendant's admittedly unreasonable belief in setting a fire was "malicious" within the meaning of section 451, which is defined similarly in section 7, because defendant's conduct was not reasonably necessary. (See *People* v. *Geddes* (1991) 1 Cal.App.4th 448, 456 [1 Cal.Rptr.2d 886].)

claim the malice required to convict for mayhem is negated by an actual but unreasonable belief appears to stem from the following language in *Flannel*: "As we said in *People* v. *Conley, supra,* 64 Cal.2d 310, 316-317, [*People* v. *Wells* (1949) 33 Cal.2d 330, 356-357 (202 P.2d 53)] 'recognized that malice aforethought is a specific mental state and that a defendant may show that he lacked that mental state when it is an essential element of the offense of which he stands accused.' [¶] The nature of malice is central here for '[m]urder is the unlawful killing of a human being . . . with malice afore-thought' [citation]; '[m]anslaughter is the unlawful killing . . . , without malice.' [Citation.] In *Conley* we examined the meaning of that mental state. We observed that a person who carefully weighs a course of action, and chooses to kill after considering reasons for and against, is normally capable of comprehending his societal duty to act within the law. 'If, *despite such awareness*, he does an act that is likely to cause serious injury or death to another, he exhibits that wanton disregard for human life or antisocial motivation that constitutes malice aforethought.' [Citation.] [¶] Given this understanding of malice aforethought, we cannot accept the People's claim that an [actual] belief, if unreasonably held, can be consistent with malice. No matter how the mistaken assessment is made, an individual cannot genuinely perceive the need to repel imminent peril or bodily injury and simultaneously be aware that society expects conformity to a different standard. Where the awareness of society's disapproval begins, an [actual] belief ends. It is the [actual] belief of imminent peril that negates malice in a case of complete self-defense; the reasonableness of the belief simply goes to the justification for the killing. [¶] This approach to unreasonable belief expresses the rule at common law. . . . [¶] California's rule on the effect of an unreasonably held belief in the need to defend is almost universally supported by those legal commentators who have given it consideration. In the words of two scholars it is 'the more humane view that, while [the defender] is not innocent of the crime, he is nevertheless not guilty of murder, rather, he is guilty of the in-between crime of manslaughter.' [Citations.] In short, the state has no legitimate interest in obtaining a conviction of murder when, by virtue of defendant's unreasonable belief, the jury entertains a reasonable doubt whether defendant harbored malice. Like-wise, a defendant has no legitimate interest in complete exculpation when acting outside the range of reasonable behavior. [Citation.] The vice is the element of malice; in its absence the level of guilt must decline." (*People* v. *Flannel, supra,* 25 Cal.3d at pp. 679-680, original italics, fns. omitted.) Although *Flannel* held such a belief could negate the "malice" required for murder; it is clear *Flannel* considered only "malice aforethought" (§ 188)[6] as it related to murder and not "malice" (§ 7) as it is required for proof of

---

[6]Section 188 provides: "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is

mayhem. Therefore, *Flannel* does not support the argument that the trial court should instruct a jury the unreasonable self-defense doctrine will negate the requisite "malice" for mayhem.

Third, aside from the statutory definitions which explicitly define malice and malice aforethought in different terms, there is authority which establishes that as a general rule the concepts are not synonymous but are distinct. (*People* v. *St. Martin* (1970) 1 Cal.3d 524, 536-537 [83 Cal.Rptr. 166, 463 P.2d 390] ["malice aforethought" required for conviction for aggravated assault by a life prisoner pursuant to section 4500 is distinct from "malice" as defined in section 7]; *People* v. *Wright, supra,* 93 Cal. at p. 566; see *People* v. *Bohmer* (1975) 46 Cal.App.3d 185, 190-191 [120 Cal.Rptr. 136].) Mayhem, unlike murder, is a general intent crime. (*People* v. *Wright, supra,* 93 Cal. at p. 566; *People* v. *Lopez* (1986) 176 Cal.App.3d 545, 549-552 [222 Cal.Rptr. 101]; *Goodman* v. *Superior Court* (1978) 84 Cal.App.3d 621, 624 [148 Cal.Rptr. 799].) The necessary intent for mayhem is inferable from the types of injuries resulting from intentional acts. (*People* v. *Sears* (1965) 62 Cal.2d 737, 745 [44 Cal.Rptr. 330, 401 P.2d 938], disapproved on another point in *People* v. *Cahill* (1993) 5 Cal.4th 478, 509-510, fn. 17 [20 Cal.Rptr.2d 582, 853 P.2d 1037]; *Goodman* v. *Superior Court, supra,* 84 Cal.App.3d at p. 624; *People* v. *Nunes* (1920) 47 Cal.App. 346, 349 [190 P. 486].) Thus, the crime is mayhem if the blow results in putting out the eye even if the person who unlawfully strikes another does not have the specific intent to commit the offense. (*Goodman* v. *Superior Court, supra,* 84 Cal.App.3d at p. 624; *People* v. *Crooms* (1944) 66 Cal.App.2d 491, 499 [152 P.2d 533]; *People* v. *Nunes, supra,* 47 Cal.App. at p. 349.)

Fourth, California's definition of the crime of mayhem has never included a malice aforethought requirement, nor have the various statutory formulations inferentially or directly suggested that an actual but unreasonable belief in the need of self-defense mitigates the offense. Under English common law, there was a requirement of malice aforethought which was not a part of California's mayhem statute when it was first enacted in 1850. (4 Blackstone, Commentaries 206.) In early English common law mayhem "was committable only by infliction of an injury which substantially reduced the victim's formidability in combat." (*Goodman* v. *Superior Court, supra,* 84 Cal.App.3d at p. 623.) Mayhem was defined by Blackstone as "the

implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart. [¶] When it is shown that the killing resulted from the intentional doing of an act with express or implied malice as defined above, no other mental state need be shown to establish the mental state of malice aforethought. Neither an awareness of the obligation to act within the general body of laws regulating society nor acting despite such awareness is included within the definition of malice."

violently depriving another of the use of such of his members as may render him the less able in fighting, either to defend himself or to annoy his adversary." (4 Blackstone Commentaries 205.) The concern was that the person not be deprived of limbs or members of the body which would in turn deprive "the King of the aid and assistance of his subjects (4 Blackstone, Commentaries 205) . . . ." (Annot. (1922) 16 A.L.R. 955, 956; Perkins & Boyce, Criminal Law (3d ed. 1982) p. 239.) Therefore, injuries which did not weaken the victim but only caused disfigurement, such as cutting off an ear or nose, were not mayhem at common law. (4 Blackstone, Commentaries 205; 1 East, Pleas of the Crown 393.) The definition was subsequently expanded by the Coventry Act which stemmed from an assault on Sir John Coventry, whose nose was slit during an altercation on a street for some obnoxious words uttered by him in Parliament. The expanded definition provided: "By this statute it is enacted that if any person shall of malice aforethought, and by lying in wait, unlawfully cut out or disable the tongue, put out an eye, slit the nose, cut off a nose or lip, or cut off or disable any limb or member of any other person, *with intent to maim or disfigure him*, such person, his counselors, aiders, and abetters, shall be guilty of felony, without benefit of clergy." (4 Blackstone, Commentaries 206-208, original italics.) The new statute did not displace the common law of mayhem but provided an increased penalty for intentional maiming and extended the crime to include intentional disfigurement. (Perkins & Boyce, Criminal Law, *supra*, p. 240.) It also contained a requirement of "malice aforethought."

California's statutory development of the crime of mayhem commenced in 1850. However, despite the common law origins of the mayhem statute, section 203 has never contained any language indicating that malice aforethought was an element of the offense. The first criminal legislation after statehood resulted from the enactment of " 'An Act concerning Crimes and Punishments' " adopted by the first Legislature on April 16, 1850. (See *People* v. *Dillon* (1983) 34 Cal.3d 441, 465 [194 Cal.Rptr. 390, 668 P.2d 697]; Kleps, *The Revision and Codification of California Statutes 1849-1953* (1954) 42 Cal.L.Rev. 766.) The Legislature first defined in 1850 the prohibited act of mayhem as follows: "Mayhem consists in unlawfully depriving a human being of a member of his or her body, or disfiguring it or rendering it useless. If any person shall unlawfully cut out or disable the tongue, put out an eye, slit the nose, ear, or lip, or disable any limb or member of another, or shall voluntarily and of purpose put out an eye or eyes, every such person shall be guilty of mayhem, and on conviction shall be punished by imprisonment in the State Prison for a term not less than one year, nor more than five years." (Stats. 1850, ch. 99, § 46, pp. 233-234.) In 1856, the Legislature amended the 1850 mayhem statute as follows: "Mayhem consists

in unlawfully depriving a human being of a member of his or her body, or disfiguring or rendering it useless. If any person shall cut out or disable the tongue, put out an eye, slit the nose, ear or lip, or disable any limb or member of another, or shall voluntarily or of purpose put out an eye or eyes, every such person shall be guilty of mayhem." (Stats. 1856, ch. 139, § 46, p. 219.)

In 1870, the Code Commission was appointed to draft a complete system of laws for presentation to the Legislature. (See Stats. 1870, ch. 516, § 2, p. 774; *Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 629 [87 Cal.Rptr. 481, 470 P.2d 617].) The source of the 1872 formulation of the mayhem statute was the 1856 version of the statute.[7] (See annot., Kerr's Cyc. Code of Cal., Ann. (1921 ed.) § 203, p. 247.) In 1872, as part of California's adoption of the Code Commission's proposed codification of the Penal Code, mayhem was defined in section 203 as follows: "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures or renders it useless, or who cuts out or disables the tongue, puts out an eye, slits the nose, ear, or lip, is guilty of mayhem." (1 Pen. Code, § 203 (1st ed. 1872, Haymond, Burch & McKune, commrs.) pp. 96-97.) The Code Commissioner's comment to the 1872 mayhem provision in the Penal Code stated: "The Code has modified the language of the Act of 1856 (Stats. 1856, p. 219), defining mayhem, but the section has not been changed in substance. Mayhem, at common law, was such a bodily injury as would render a man less able in fighting to defend himself or annoy his adversary;

---

[7]There are some annotators who have suggested that the 1872 formulation of the mayhem statute was based on the New York "Field's Draft, § 263" which was later enacted as New York Penal Code section 206. (See prior law annot. Deering's Ann. Pen. Code (1985 ed.) § 203, p. 179; annot., Deering's Penal Code of the State of Cal., annot. (1931 ed.) § 203, p. 95.) However, as will be noted in the body of this opinion, Code Commissioners Creed Haymond and John C. Burch who annotated the 1872 published version of the Penal Code made no direct reference to the so-called "Field's Draft" prepared by Stephen Dudley Field as well as others or the New York Penal Code. Further, the language of the New York Penal Code sections that prohibited "maiming" were different from California's Penal Code section 203 as enacted in 1872. For example, in 1865, New York Penal Code section 263 defined the crime of "maiming" as follows: "Every person who, with premeditated design to injure another, inflicts upon his person any injury which disfigures his personal appearance, or disables any member or organ of his body, or seriously diminishes his physical vigor, is guilty of maiming." (Penal Code of the State of New York (1865 ed.) § 263, p. 89.) Needless to note, that language is far different than that found in the 1872 formulation of California's section 203. We need not discuss the murky question of the precise role, if any, the New York "maiming" statute played in the development of the California mayhem statute adopted in 1872. The California Supreme Court has held that the New York "maiming" law can have no effect upon the interpretation of California's Penal Code section 203. In *People* v. *Wright*, *supra*, 93 Cal. at page 567, while discussing two New York decisions, the California Supreme Court held, "The reasoning of the court in these decisions upon the New York statute, which, as will be seen, is dissimilar to our own, can have no application to cases of mayhem arising under our code."

but it was not mayhem if the injury only disfigured; upon this distinction, the cutting off, disabling, or weakening a man's hand, or finger, or striking out an eye, or fore tooth, or castrating him, are maims; but the cutting off his ear, nose, etc., are not such at common law." (See code comrs. note foll. 1 Pen. Code, § 203 (1st ed. 1872, Haymond & Burch, commrs.—annotators) pp. 96-97.) In 1874, the mayhem statute was amended to read as follows: "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem." (Cal. Code Amends. 1873-1874, ch. 614, § 17, p. 427.) In 1989, section 203 was amended to read: "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem." (Stats. 1989, ch. 1360, § 106, p. 5864.)

On the first occasion it was interpreted, the Supreme Court stressed the distinction between the terms "malice" as an element of mayhem and "malice aforethought" which is required for murder in *People* v. *Wright, supra,* 93 Cal. at page 566. In *People* v. *Wright, supra,* 93 Cal. at pages 566-567, the Supreme Court distinguished the two concepts on the basis of the additional element required to convict for crimes in which "malice aforethought" is required. *Wright* explained "[A] concurrence of act and intent, or criminal negligence, are the only elements essential to constitute a crime or public offense . . . . It therefore follows that as malice afore-thought is not an essential element in the crime of mayhem, proof of premeditation or deliberation is not required. But the requirements of the statute in such cases will be fully met by proof of the commission of the act, from which the law will presume, though it be done in pursuance of an intent formed during the conflict, that it was done unlawfully and maliciously,— that is, 'with a wish to . . . . injure another person, or an intent to do a wrongful act,'—unless the evidence tends to show to the contrary,—that is, that is was done in necessary self-defense, and under circumstances that were at the time unavoidable, in order to prevent the infliction or attempted infliction of some great bodily harm by the party injured. . . . [¶] A careful examination of numerous reported cases show that the crime of mayhem is generally committed in the midst of sudden altercations, without premedita-tion or deliberation, in view of which we are satisfied that the object of the [L]egislature in the enactment of section 203 . . . was to suppress such shocking brutality in personal rencounters; and if proof of premeditation or deliberation was required, as contended for by appellant, the statute would be unavailable for the accomplishment of the very purpose for which it was plainly intended." (*Ibid.*) Since *Wright* was decided, California courts have

consistently refused to impose any specific intent, premeditation, deliberation, or malice aforethought element on mayhem; rather, all that is necessary is malice and a general criminal intent. (*People* v. *Sears, supra,* 62 Cal.2d at pp. 744-745; *People* v. *Pitts* (1990) 223 Cal.App.3d 1547, 1557-1558 [273 Cal.Rptr. 389]; *People* v. *Lee* (1990) 220 Cal.App.3d 320, 325 [269 Cal.Rptr. 434]; *People* v. *Ferrell* (1990) 218 Cal.App.3d 828, 832 [267 Cal.Rptr. 434]; *People* v. *Campbell* (1987) 193 Cal.App.3d 1653, 1668 [239 Cal.Rptr. 214]; *People* v. *Lopez, supra,* 176 Cal.App.3d at pp. 550-551; *Goodman* v. *Superior Court, supra,* 84 Cal.App.3d at pp. 624-625; *People* v. *Jentry* (1977) 69 Cal.App.3d 615, 628 [138 Cal.Rptr. 250]; *People* v. *Garcia* (1970) 5 Cal.App.3d 15, 18 [85 Cal.Rptr. 36]; *People* v. *Vigil* (1966) 242 Cal.App.2d 862, 864 [51 Cal.Rptr. 860]; *People* v. *Nunes, supra,* 47 Cal.App. at p. 349.) Accordingly, apart from the *McKelvy* lead opinion, there is no authority to support defendant's claim that the mere use of the term "malicious" in section 203 requires a court to instruct a jury that an actual but unreasonable belief will negate the malice required to convict for mayhem because *Flannel* held the element of "malice aforethought" in a murder prosecution may be mitigated by an actual but unreasonable belief in the need to defend oneself. Because the concepts are distinct and no specific intent is required to commit mayhem, the necessary intent being inferable from the types of injuries resulting from intentional acts, defendant's conduct in kicking Mr. Koloamatangi in the eye which resulted in an inability to see out of that eye was sufficient to constitute the crime of mayhem. (*People* v. *Sears, supra,* 62 Cal.2d at p. 745; *Goodman* v. *Superior Court, supra,* 84 Cal.App.3d at p. 624; *People* v. *Nunes, supra,* 47 Cal.App. at p. 349.) Unlike the situation in *Flannel* where the imperfect self-defense rule was grounded in part on "both well-developed common law and in the statutory requirement of malice" aforethought (*In re Christian S., supra,* 7 Cal.4th at p. 777), mayhem involves a different requisite mental state and has no statutory history recognizing a malice aforethought element or the availability of the *Flannel* defense.

## IV. DISPOSITION

The judgment is affirmed.

Grignon, J., and Godoy Perez, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 17, 1994. Kennard, J., was of the opinion that the petition should be granted.