Filed 6/9/25  P v. Jackson CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D083160 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN414079) |
| ERIC J. JACKSON, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Sim von Kalinowski, Judge.  Affirmed.

Heather E. Shallenberger, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Liz Olukoya, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Eric J. Jackson of simple mayhem and child abuse. (Pen. Code,[1] §§ 203, 273a, subd. (a).) The court sentenced Jackson to 12 years in state prison. On appeal, Jackson challenges only his conviction for simple mayhem, contending there is insufficient evidence that his abuse against the victim resulted in loss or disfigurement to a member of her body.

We conclude substantial evidence supports Jackson's simple mayhem conviction. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *People's Evidence*

In approximately late December 2019, Jackson met Cierra D., and they began dating shortly thereafter. In March 2020, Cierra, her four-year-old daughter Avery G., Cierra's grandmother Margaret L., and Jackson moved into a two-bedroom apartment.

On May 4, 2020, Margaret asked Jackson to move out. Cierra left with Jackson, taking Avery with her. Cierra booked and paid for a hotel room in Carlsbad, where they stayed for two weeks. For the first few days, things were "normal." Thereafter, Cierra noticed that Jackson would get "very irritable," "lash out," and physically abuse her, including hitting and choking her in Avery's presence. During one of their arguments, Jackson placed a gun to Cierra's forehead and inside her mouth, threatening to pull the trigger if she "didn't shut the F up." Cierra routinely left Avery alone with Jackson when she went out to buy food.

During their stay in the hotel, Cierra noticed that Avery had lost her appetite and had bruises on her back and shoulders. Cierra asked about the bruises, and Avery confided that Jackson hit her. Cierra confronted Jackson. He denied hitting Avery, claiming she must have fallen. Cierra decided to

---

[1] All further statutory references are to the Penal Code.

take Avery and leave Jackson. Jackson stopped Cierra by putting a gun to the back of her head. The following day, Jackson, Cierra, and Avery moved to another hotel.

Shortly thereafter, Cierra noticed that Avery was not feeling well. Avery went into the bathroom and vomited "green mucous and blood." Cierra asked Avery if Jackson had "hit her again and she said[,] 'Yes.'" That night, Cierra waited for Jackson to fall asleep before she and Avery attempted to leave. Awakened by the commotion, Jackson strangled Cierra until she lost consciousness. After Cierra regained consciousness, she waited for Jackson to fall back asleep, located her cell phone in his backpack, and messaged a relative, stating their location and asking her to call the police. The relative called Margaret who alerted the hotel and called the police.

On the morning of May 19, 2020, a police negotiator called Cierra's room. The officer asked Cierra to go down to the lobby for a welfare check. Fearful of Jackson, Cierra hung up the phone. A few minutes later, the officer called back and instructed Cierra to respond by saying only yes or no, and to take her daughter and immediately leave. Instead, Cierra told Jackson about the police. As soon as Jackson opened the front door, the police tackled him. Cierra ran to Avery, who was laying on the bed. During a lawful search, police found in Jackson's backpack a 9-millimeter gun with three unspent bullets.

Officers at the scene described Avery as "distraught," in "pretty rough shape," and lethargic and concluded she needed prompt medical care. An ambulance rushed Avery to the hospital where an examination revealed bruises on her head, shoulders, arms, face, chest, and abdomen. She complained of significant abdominal pain. An emergency ultrasound revealed fluid in Avery's abdomen, indicating significant intraabdominal

3

injury and internal bleeding. Doctors diagnosed Avery with a grade-three laceration of the liver, contusions on both kidneys, traumatic injury to the pancreas, a perforated bowel, and a compression fracture at T8 vertebrae. Avery underwent emergency surgery to prevent septic shock, cardiac arrest, and death. Due to her "blunt force trauma," doctors removed her inflamed appendix. Avery's doctor explained that the "severe extent" of her injuries were similar to those seen in "serious car crashes and . . . falls over 20 feet." The doctor opined her injuries were not accidental but "definitely inflicted."

Approximately three days after her surgery, Avery confided to her nurse that Cierra had "a friend named Eric [Jackson] who punched [her] in [the] stomach." Avery testified that while her mother was out getting food or in the shower, Jackson would hit her, including in the face, causing her to "pass out," and if she screamed or made a sound he would get "even more mad[ ]," and that she still has a scar on her abdomen from the emergency surgery due to the attack.

## B. *Defense Evidence*

Jackson denied ever being aggressive or violent towards Avery. He testified that while in the hotels, Cierra did not feed or bathe Avery; and that Cierra used "drugs" and yelled and got physical with her daughter.

The day before his arrest, Jackson saw Cierra jump "knees first" onto Avery's back and repeatedly hit her daughter. Jackson stopped the attack by restraining Cierra.[2] He had planned to leave Cierra the next day, but police took him into custody before he could leave.

---

[2]     Cierra and Avery each denied Cierra abused Avery.

## DISCUSSION

Jackson challenges his simple mayhem conviction, arguing there is insufficient evidence that the loss of Avery's appendix[3] or disfigurement to her abdomen were the direct, natural and probable consequence of his abuse.

### A. *Guiding Principles*

We will not reverse the judgment " ' "unless it appears that 'upon no hypothesis whatever is there sufficient substantial evidence to support' " ' " the jury's verdict. (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) Substantial evidence is "evidence that is reasonable, credible, and of solid value . . . ." (*Ibid.*) The testimony of a single witness may constitute substantial evidence as long as it is not physically impossible or inherently improbable. (*People v. Ghobrial* (2018) 5 Cal.5th 250, 281.) "That the evidence might lead to a different verdict does not warrant a conclusion that the evidence supporting the verdict is insubstantial." (*People v. Holt* (1997) 15 Cal.4th 619, 669.) To determine whether substantial evidence supports Jackson's simple mayhem conviction, we review the whole record to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Manibusan*, at p. 87.) We review the evidence in the light most favorable to the prosecution. (*Ibid.*)

To convict a person of simple mayhem, the prosecution must prove the defendant "unlawfully and maliciously deprive[d] a human being of a member of his [or her] body, or disable[d], disfigure[d], or render[ed] it useless, or cut[ ] or disable[d] the tongue, or put[ ] out an eye, or slit[ ] the nose, ear, or lip." (§ 203.) Simple mayhem does not require proof of a specific

---

[3]    Jackson repeatedly references the removal of Avery's pancreas; however, the medical testimony describes bruising to her pancreas and removal of her appendix. For accuracy, we treat Jackson's references to Avery's removed pancreas as references to her appendix.

intent to cause a disabling or disfiguring injury. (*People v. Ferrell* (1990) 218 Cal.App.3d 828, 832-833.) A disabling injury must be more than "slight and temporary." (*People v. Thomas* (1979) 96 Cal.App.3d 507, 512.) A disfiguring injury must be permanent even if cosmetic repair is medically feasible. (*People v. Newby* (2008) 167 Cal.App.4th 1341, 1347.)

Someone acts maliciously when he intentionally does a wrongful act or when he acts with the unlawful intent to vex, annoy, or injure someone else. (§ 7, subd. (b)(4).) An act causes an injury if the injury is the direct, natural, and probable consequence of the act, and the injury would not have happened without the act. (*See People v. Carney* (2023) 14 Cal.5th 1130, 1138.) A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. (*People v. Prettyman* (1996) 14 Cal.4th 248, 291.)

## B. *Analysis*

Jackson argues the prosecution must prove a "general intent to willfully commit the act under such circumstances that the direct, natural, and probable consequence would be the deprivation, disabling, or disfiguring" of Avery's body. The law requires proof that a defendant acted "maliciously" or with unlawful intent. The defendant's actions must also result in the loss or disfigurement of a member of Avery's body. (See *People v. Nunes* (1920) 47 Cal.App. 346, 349.)

The parties agree there is "no dispute that appellant abused Avery" and that the trial court found true aggravating factors including great violence and great bodily harm. Jackson argues that "there is no evidence in the record that the injuries she sustained to her [appendix] and the resulting surgical scar were a natural and probable consequence of the abuse" he inflicted. Specifically, he claims there is insufficient proof of causation and

6

that "the defendant's act must cause the disabling or disfiguring injury." We disagree.

First, even before medical intervention, Jackson's conduct of beating Avery disabled her appendix and bowel. (*People v. Cartier* (1960) 54 Cal.2d 300, 310 ["It is mayhem if the injury inflicted deprives the person injured of . . .the usual uses of the severed organ."].) Avery's doctor explained that removing her appendix was necessary because it was inflamed and could spread infection inside of her abdomen. Moreover, to stop the leakage of "fluid, stool, [and] bacteria," she needed a bowel resection to repair the perforation to her bowel. Thus, Jackson's conduct directly resulted in Avery's inability to use her appendix and bowel. (See, e.g., *People v. Sekona* (1994) 27 Cal.App.4th 443, 457 [inability to use eye that defendant kicked constituted mayhem].)

Second, Jackson argues that because he "did not directly remove Avery's [appendix] he cannot be held liable for mayhem." While it is true that Jackson himself did not remove Avery's appendix, because the "severe extent" of the injuries Jackson inflicted were similar to those seen in "serious car crashes and . . . falls over 20 feet," surgery was foreseeable. Additionally, the "blunt force trauma that [Jackson inflicted on Avery's] abdomen . . . led to sheering forces applied to that part of the organ that . . . created inflammation . . . of the appendix." Thus, as a direct result of Jackson's act, the appendix needed to be removed so it would not spread infection inside her abdomen. (See *People v. Carney, supra*, 14 Cal.5th at p. 1138 [injury would not have happened without act].) A reasonable person would know that internal injuries, like damage to the appendix, are likely to require surgical repair. (*People v. Cartier, supra*, 54 Cal.2d at p. 310 [deprivation of member of person's body is mayhem].)

7

Finally, Jackson argues that the scar on Avery's abdomen was not a natural and probable consequence of the abuse he inflicted.  However, there is no requirement that the defendant directly creates a scar to be liable for mayhem.  Scars are a known and obvious result of surgery.

Here, the injuries were the direct, natural and probable consequence of Jackson beating Avery, and the appendix removal, bowel resection, and scarring would not have happened without Jackson's act.

## DISPOSITION

Jackson's judgment of conviction is affirmed.

O'ROURKE, Acting P. J.

WE CONCUR:

IRION, J.

KELETY, J.

8