Filed 6/27/14

<u>CERTIFIED FOR PARTIAL PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>CARLOS MIGUEL IRAHETA,<br><br>     Defendant and Respondent. | B249264<br><br>(Los Angeles County<br>Super. Ct. No. YA053907) |

     APPEAL from a judgment of the Superior Court of Los Angeles County, Steven R. Van Sicklen, Judge. Reversed and remanded.

     Jackie Lacey, District Attorney, Roberta Schwartz, Phyllis C. Asayama and Matthew Brown, Deputy District Attorneys, for Plaintiff and Appellant.

     Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Respondent.

---

*     Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts 2 and 3 of the DISCUSSION.

A jury found defendant and respondent Carlos Miguel Iraheta guilty of shooting at an occupied motor vehicle in violation of Penal Code section 246.[1]  Before sentencing, Iraheta moved for a new trial on several grounds, including that the trial court had erred by declining to instruct the jury on imperfect self-defense in relation to the section 246 charge.  The trial court concluded it had committed instructional error, and granted Iraheta's motion.  Plaintiff and appellant the People of the State of California appeal the trial court's ruling.  In the published portion of this opinion, we agree with the People that the court properly declined to instruct on imperfect self-defense on the charge of shooting at an occupied motor vehicle, and therefore its ruling granting a new trial was an abuse of discretion.  In the unpublished portion, we conclude that the other grounds raised in the new trial motion do not support the trial court's ruling.  Accordingly, we reverse the trial court's order and remand for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts*

    A. *People's evidence*

Viewed in accordance with the usual rules governing appellate review, the evidence relevant to the issues raised on appeal established the following.[2]

    (1) *The December 2002 shooting of Michael Orozco*

On December 20, 2002, at approximately 5:30 p.m., Noe Martinez drove his white Honda Civic to the Jr. Market in Inglewood.  Inside the market, Jose Tovar, whom Martinez did not know, kept staring at him, giving him a bad feeling.  When Martinez left the market, Tovar walked toward Martinez's Honda, and pulled out a cellular telephone when a police car pulled up.  Tovar was a member of the Inglewood 13 criminal street gang.

---

[1]    All further undesignated statutory references are to the Penal Code.

[2]    Additional evidence will be discussed where relevant, *post.*

Martinez drove to his friend Michael Orozco's home, where he socialized and drank beer. At approximately 8:30 that evening, Orozco and Martinez headed for another friend's home. Because Martinez was feeling "buzzed," Orozco drove Martinez's Honda. Their route took them past the Jr. Market.

Meanwhile, Iraheta drove his girlfriend Melody Maciel, his younger brother Richard Iraheta,[3] and his stepbrother Alexis Moreno, to the Jr. Market in his Camaro. Once there, he stopped to talk to his friend, Tovar. Martinez's car passed by the market, and Tovar pointed at it. Martinez saw Tovar's gesture, and told Orozco to "step on it."

When Martinez and Orozco drove away, Iraheta followed them in his Camaro. Orozco drove to 65th Street and, at Martinez's direction, stopped the car. Martinez exited the Honda to talk to the people in the Camaro. He was wearing a red hat and a dark red jacket or shirt. The Camaro pulled up slowly. Iraheta was driving. Martinez lifted up his hands and said, " 'what's going on?' " As the Camaro passed the Honda, Iraheta fired a single gunshot at the Honda, and sped off. The shot shattered the Honda's driver's side window and hit Orozco in the neck, fatally wounding him. Neither Orozco nor Martinez were armed.

(2) *The investigation*

Officers stopped the Camaro shortly after the shooting. Iraheta was driving. One of the officers found a gun under the Camaro's front passenger seat, obscured by trash. The gun was loaded with six rounds, one of which was expended. Forensic testing revealed that the bullet that killed Orozco had been fired from the gun. At a field showup conducted shortly after the shooting, Martinez identified the Camaro and Iraheta. Officers did not find a gun in the Honda.

---

[3] For ease of reference, we hereinafter sometimes refer to Richard Iraheta by his first name.

(3) *Statements by the other occupants of the Camaro*

Moreno and Maciel testified that as it passed the Jr. Market, the Honda slowed and then sped off. En route to Maciel's house, the group came upon the Honda stopped in the middle of the road, blocking their path. Maciel asked Orozco to move. Martinez approached the back of the Camaro. Both Maciel and Moreno heard Richard say, " 'he's got a gun.' " Iraheta then pulled a gun from under the seat and fired a single shot at the Honda. In a recorded police interview, Moreno stated that Iraheta had followed the Honda after leaving the market.

(4) *Gang evidence*

A gang expert testified regarding the characteristics and activities of the Inglewood 13 gang. Among other things, he opined that Iraheta was an Inglewood 13 gang member, based on his "West L.A." tattoo, attire, and association with other gang members. When given a hypothetical based on the facts of the case, the expert opined that the motive for the shooting was gang-related.

B. *Defense evidence*

Iraheta testified in his own defense. At the time of the shooting, he was 19 years old, had no criminal record, was in the military reserves, and was not a gang member. He and Maciel were planning on getting married, and he had just been hired by Bank of America and was enrolled to start classes at ITT Tech. His "West L.A." tattoo was not a gang tattoo. He had the gun for protection because he had been beaten up near his house by gang members a few months before the shooting.

On the night of the shooting, he drove by the Jr. Market and his friend Tovar flagged him down. While he and Tovar were talking, the Honda passed by. Tovar warned Iraheta that the occupants of the Honda had been "cruising around and looking for trouble" and had " 'mad-dogg[ed]' " him earlier that day. Iraheta left the Jr. Market a few minutes later. His route took him to 65th Street. The Honda was stopped in the street, blocking it. Martinez was standing outside the car, staring at Iraheta. Iraheta signaled to Martinez to move the car. Martinez then put up his hands up as if to say " 'What's up?' " Iraheta tried to go around the Honda. Martinez approached the back of

4

the Camaro. When the Camaro was approximately parallel to the Honda, Richard said, " 'keep going. He gots a gun.' " Iraheta saw Orozco looking at him and saying something. Orozco had a small pistol in his hand and was tapping it on the Honda's window. Iraheta fired one round while simultaneously hitting the gas pedal. On cross-examination, Iraheta admitted he had previously testified that he was unsure whether Orozco had a gun or a cellular telephone in his hand.[4]

### 2. *Procedure*

An information filed on May 1, 2003, charged Iraheta with murder (§ 187, subd. (a)). It also alleged that Iraheta personally and intentionally used and discharged a firearm, causing death (§ 12022.53, subds. (b), (c) & (d)). Iraheta was tried by a jury, convicted of second degree murder with the firearm enhancement, and sentenced to 40 years to life in prison. We affirmed his conviction in an unpublished opinion. (*People v. Iraheta* (Apr. 30, 2008, B173223.)[5] Among other things, we held Iraheta was properly convicted of second degree felony murder. (*People v. Iraheta, supra*, B173223, p. 6.)

The California Supreme Court subsequently granted Iraheta's petition for review and, on June 10, 2009, transferred the case back to us with directions to vacate our decision and reconsider the cause in light of *People v. Chun* (2009) 45 Cal.4th 1172. Upon reconsideration, we concluded *Chun* required reversal of Iraheta's murder conviction. (*People v. Iraheta* (Nov. 20, 2009, B173223) [nonpub. opn.], pp. 4, 10-11.)[6]

---

[4] The defense presented additional witnesses, and the People presented rebuttal witnesses. Because this testimony is not directly relevant to the issues presented on appeal, we do not detail it here.

[5] Prior to our April 30, 2008 opinion, we affirmed Iraheta's conviction in an unpublished opinion filed on January 26, 2006. Upon learning that Iraheta's appellate counsel had abandoned representation of him prior to the conclusion of the appeal, we recalled the remittitur, vacated the January 26, 2006 opinion, and directed the appointment of new counsel. (*People v. Iraheta, supra,* B173223, pp. 3-4.)

[6] As the People request, we take judicial notice of our unpublished opinions filed in this matter on April 30, 2008 and November 20, 2009. (Evid. Code, §§ 452, subd. (d), 459.)

The People filed an amended information on October 5, 2010, again charging Iraheta with murder (§ 187, subd. (a), count 1), and a second amended information on October 3, 2011, adding a second count of shooting at an occupied motor vehicle (§ 246, count 2). Iraheta's retrial commenced in March 2013. The jury found Iraheta guilty of shooting at an occupied motor vehicle, and found true the allegation he had personally and intentionally used and discharged a firearm, causing Orozco's death. It deadlocked on count 1, the murder charge, and the court declared a mistrial on that count. Before sentencing, Iraheta filed motions for a new trial and arrest of judgment on a variety of grounds. On May 9, 2013, the trial court granted the new trial motion on the ground that it had erred in failing to instruct the jury on imperfect self-defense in regard to count 2, shooting at an occupied motor vehicle in violation of section 246.

On May 31, 2013, the People appealed the trial court's order. (§ 1238, subd. (a)(3).) On July 24, 2013, we granted the People's petition for a writ of supersedeas and issued a stay of proceedings pending finality of this appeal.

DISCUSSION

**1. *The trial court correctly declined to instruct on imperfect self-defense on count 2, shooting at an occupied motor vehicle.***

A. *Additional facts*

The defense requested that the court instruct the jury on "imperfect" self-defense as to both charged counts.[7] Defense counsel also requested an instruction on mistake of

---

[7] The defense proposed the following special instruction: "You should consider whether the defendant acted in 'imperfect self-defense' and 'imperfect defense of others' during your deliberations in connection with the offense of Penal Code Section 246, Shooting into an Occupied Vehicle . . . and the enhancement . . . . [¶] If you find that the defendant acted in 'imperfect self-defense' or 'imperfect defense of others,' then you may not find beyond a reasonable doubt that the defendant acted with the element of 'malice' in connection with CALCRIM [No.] 965. 'Malice' is an element of the offense of Penal Code Section 246 that must be proven beyond a reasonable doubt. Accordingly, if you do not find that the prosecution has proven the element of malice, then you must find the defendant not guilty of the offense of Penal Code Section 246." The proposed instruction then went on to define imperfect self-defense and great bodily injury, and

6

fact.[8]  Defense counsel urged that imperfect self-defense could negate malice, an element of shooting at an occupied motor vehicle in violation of section 246.  The People objected.  The prosecutor pointed out that imperfect self-defense was not actually a defense, but operated only to reduce a murder to manslaughter, and was inapplicable to crimes other than murder.  The trial court concluded the imperfect self-defense instruction was inapplicable to the charge of shooting at an occupied motor vehicle.  It further reasoned that "mistake of fact is basically imperfect self-defense," and declined to give that instruction because it was cumulative of the self-defense instructions already given.

Thereafter, the trial court instructed the jury on "perfect" self-defense as to both the murder and the shooting at an occupied motor vehicle charges.[9]  It instructed on

---

explained that the difference between self-defense and imperfect self-defense was whether the defendant's belief in the need to use deadly force was reasonable.

[8]     That proposed instruction was as follows:  "You should consider whether the mistake-of-fact doctrine applies to the defenses of self-defense and defense of others during your deliberations in conjunction with all offenses and enhancements, including Penal Code Section 246, Shooting into an Occupied Vehicle . . . and the enhancement . . . .  [¶]  The mistake-of-fact doctrine is defined in CALCRIM [No.] 3406."

[9]     CALCRIM No. 505, as given here, provided in pertinent part:  "The defendant is not guilty of murder if he was justified in killing someone in self-defense or defense of another.  The defendant acted in lawful self-defense or defense of another . . . if:  [¶] 1.  The defendant reasonably believed that he or Melody Maciel, Richard Iraheta, and Alexis Moreno were in imminent danger of being killed or suffering great bodily injury; [¶]  2.  The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger; [¶]  AND  [¶]  3.  The defendant used no more force than was reasonably necessary to defend against that danger.  [¶]  Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.  The defendant must have believed there was imminent danger of death or great bodily injury to himself or someone else.  Defendant's belief must have been reasonable and he must have acted only because of that belief.  The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation.  If the defendant used more force than was reasonable, the killing was not justified."  The instruction also advised that the People had the burden of proving beyond a reasonable doubt that the killing was not justified.

7

imperfect self-defense as to the murder charge only, as well as the difference between "perfect" and "imperfect" self-defense.[10]

During deliberations, two jurors sent a note to the court asking whether, in regard to the section 246 charge and the lesser included offense of shooting a firearm in a grossly negligent manner, "the term self-defense include[s] both imperfect and complete self defense? [¶] Or in those instances does 'self-defense' only mean complete self-defense?" Consistent with its earlier ruling, and over a defense objection, the trial court informed the jury: "Imperfect self[-]defense does not apply to [section] 246 (willful and malicious shooting into an occupied motor vehicle) or [section] 246.3 (negligently

_____

The court instructed on self-defense in regard to section 246 as follows: "You should consider whether the defendant acted in 'self-defense' and 'defense of others' during your deliberations in connection with the offense of Penal Code Section 246, Shooting into an Occupied Vehicle (CALCRIM [No.] 965 defines the elements of the offense of Penal Code Section 246) and the enhancement (CALCRIM [No.] 3150 defines the elements of the enhancement). [¶] If you find that the defendant acted in 'self-defense' or 'defense of others,' then you must find the defendant not guilty of the offense of Penal Code Section 246, Shooting into an Occupied Vehicle. [¶] If you find that the defendant acted in 'self-defense' or 'defense of others,' then you must find the enhancement of Discharging a Firearm Causing Injury or death to be not true." CALCRIM No. 965 reiterated that the People had the burden to prove Iraheta did not act in self-defense in regard to the section 246 charge.

**10**     The latter instruction provided: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense or imperfect defense of another. [¶] If you conclude the defendant acted in complete self-defense or defense of another, his action was lawful and you must find him not guilty of any crime. The difference between complete self-defense or defense of another and imperfect self-defense or imperfect defense of another depends on whether the defendant's belief in the need to use deadly force was reasonable. [¶] The defendant acted in imperfect self-defense or imperfect defense of another if: [¶] 1. The defendant actually believed that he or someone else, Melody Maciel, Richard Iraheta, or Alexis Moreno, were in imminent danger of being killed or suffering great bodily injury; [¶] AND [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] BUT [¶] 3. At least one of those beliefs was unreasonable."

8

shooting into an occupied motor vehicle). [¶] Only self-defense, or defense of another apply to these two charges."

Iraheta argued in his new trial motion that the jury should have been instructed that imperfect self-defense applied to the section 246 charge. Iraheta urged, as he had earlier, that an unreasonable belief in the need for self-defense could negate malice, an element of section 246. The People countered that the theory of imperfect self-defense is inapplicable to the crime of shooting at an occupied motor vehicle, and the legal principles relevant to mistake of fact were covered by other instructions.

Relying on *People v. McKelvy* (1987) 194 Cal.App.3d 694, the trial court granted the new trial motion on the ground it had erred by failing to instruct on imperfect self-defense in regard to count 2, shooting at an occupied vehicle. The court reasoned that the authorities cited by the People (*People v. Watie* (2002) 100 Cal.App.4th 866; *People v. Sekona* (1994) 27 Cal.App.4th 443) held only that an imperfect self-defense instruction need not be given sua sponte, whereas here the defense requested the instruction. The court explained: "[T]he reasoning in *McKelvy* makes sense to me. . . . [I]f this were a case where there were no cars involved and somebody is on one side of the sidewalk and another person is on the other side, and the exact same facts where somebody exhibits arguably a gun which in retrospect may not have been a gun, and the assailant shoots and kills that person, you have murder or manslaughter depending if it's imperfect self-defense. [¶] But if [you] put walls around the people in a car or a house, you don't get the benefit of that argument. [¶] And it's hard conceptually for me to grasp or associate any common sense with that argument unless there's some policy reasons I'm just not considering."

### B. *Discussion*

A criminal defendant may move for a new trial on specified grounds, including instructional error. (§ 1181; *People v. Ault* (2004) 33 Cal.4th 1250, 1260; *People v. Masotti* (2008) 163 Cal.App.4th 504, 507.) The trial court has broad discretion in ruling on a new trial motion, and its decision will be disturbed only for clear abuse of that discretion. (*Ault,* at p. 1260; see generally *People v. Richmond* (1991) 2 Cal.App.4th

9

610, 618.)  Such an abuse of discretion arises if the court's decision is based on an incorrect legal standard.  (*People v. Knoller* (2007) 41 Cal.4th 139, 156.)

The People urge the trial court abused its discretion by granting a new trial here, because an imperfect self-defense theory cannot apply to crimes other than murder. Iraheta, on the other hand, urges that the trial court's ruling was correct, because imperfect self-defense can operate as "a theory in mitigation to negate the element of malice."

"The doctrine of self-defense embraces two types:  perfect and imperfect." (*People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1168.)  "Perfect" self-defense requires that a defendant have an honest and reasonable belief in the need to defend himself or another.  (*Ibid.*)  Imperfect self-defense, sometimes referred to as a "*Flannel* defense" (*People v. Flannel* (1979) 25 Cal.3d 668; *People v. Quintero* (2006) 135 Cal.App.4th 1152, 1166), "is the killing of another human being under the actual but unreasonable belief that the killer was [in] imminent danger of death or great bodily injury.  [Citation.] Such a killing is deemed to be without malice and thus cannot be murder." (*People v. Booker* (2011) 51 Cal.4th 141, 182; *People v. Duff* (2014) 58 Cal.4th 527, 561-562.) Imperfect self-defense is therefore a " 'theor[y] of partial exculpation' that reduce[s] murder to manslaughter by negating the element of malice."  (*People v. Moye* (2009) 47 Cal.4th 537, 549.)  As explained by our Supreme Court:  " '[U]nreasonable self-defense' is . . .  not a true defense; rather, it is a shorthand description of one form of voluntary manslaughter.  And voluntary manslaughter, whether it arises from unreasonable self-defense or from a killing during a sudden quarrel or heat of passion, is not a defense but a crime; more precisely, it is a lesser offense included in the crime of murder."  (*People v. Barton* (1995) 12 Cal.4th 186, 200-201; *People v. Elmore* (2014) 59 Cal.4th 121, 134.)

"It is settled that a violation of section 246 is a general intent crime."  (*People v. Hernandez* (2010) 181 Cal.App.4th 1494, 1500; *People v. Ramirez* (2009) 45 Cal.4th 980, 985, fn. 6; *People v. Overman* (2005) 126 Cal.App.4th 1344, 1356; *People v. Watie, supra,* 100 Cal.App.4th at p. 879; *People v. Jischke* (1996) 51 Cal.App.4th 552, 556.)

Section 246 provides in pertinent part: "Any person who shall *maliciously and willfully* discharge a firearm at an . . . occupied motor vehicle . . . is guilty of a felony. . . ." (Italics added.) "Conviction under a statute proscribing conduct done 'willfully and maliciously' does not require proof of a specific intent. [Citation.]" (*People v. Licas* (2007) 41 Cal.4th 362, 366; *People v. Rodarte, supra*, 223 Cal.App.4th at p. 1168; *Hernandez,* at p. 1500; *People v. Atkins* (2001) 25 Cal.4th 76, 85–86; *People v. Alvarado* (2005) 125 Cal.App.4th 1179, 1188.) "Section 7, subdivision 1, states: ' "willfully," ' . . . implies simply a purpose or willingness to commit the act . . . referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage.' 'Maliciously' is defined as 'a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law.' (§ 7, subd. 4.)" (*Licas,* at p. 366.) " ' "When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intent is deemed to be a general criminal intent. . . . The only intent required for a general intent offense is the purpose or willingness to do the act or omission. [Citation.]" ' " (*Rodarte,* at p. 1168; *Hernandez*, at p. 1500; *People v. Verlinde* (2002) 100 Cal.App.4th 1146, 1166–1167.) Thus, for section 246, " '[a]s for all general intent crimes, the question is whether the defendant intended to do the proscribed act.' [Citation.] 'In other words, it is sufficient for a conviction [of section 246] if the defendant intentionally did that which the law declares to be a crime.' [Citation.]" (*Overman*, at p. 1356; *Jischke*, at p. 556.)

In granting Iraheta's new trial motion, the trial court relied primarily on *People v. McKelvy, supra,* 194 Cal.App.3d 694. In *McKelvy,* a single justice concluded the unreasonable self-defense doctrine applied to the general intent crime of mayhem, and the court had a sua sponte duty to instruct on the doctrine. (*Id*. at pp. 702-704.) *McKelvy* reasoned that inclusion of the word "maliciously" in the mayhem statute required proof of something more than an intentional act. The lead opinion reasoned: "Although the 'malice' required for the offense of mayhem differs from the 'malice aforethought' with

11

which *Flannel* was concerned, it is equally true in both cases that the requisite state of mind is inconsistent with a genuine belief in the need for self-defense. One who truly believes there is a need for self-defense cannot be said to act with intent to 'vex, injure or annoy' and may be found guilty of no more than an assault or battery." (*Id.* at p. 702, fn. omitted.)

*McKelvy* is not persuasive for several reasons. First, the lead opinion did not command a majority for its conclusion because the two non-authoring justices concurred only in the result. (See *People v. Vallejo* (2013) 214 Cal.App.4th 1033, 1040 [the *McKelvy* lead opinion "is not binding authority"]*; People v. Quintero, supra,* 135 Cal.App.4th at p. 1166; *People v. Sekona, supra,* 27 Cal.App.4th at p. 451.) Second, the lead opinion's conclusion regarding the imperfect self-defense instruction "was dictum, because the court affirmed the defendant's conviction despite the absence of a *Flannel* instruction." (*People v. Hayes* (2004) 120 Cal.App.4th 796, 801-802.) Third, no other reported decision has followed *McKelvy*, and its reasoning "has been uniformly rejected." (*People v. Rodarte, supra,* 223 Cal.App.4th at p. 1169; *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 835.) Indeed, appellate courts since *McKelvy* have held imperfect self-defense instructions are inapplicable or need not be given sua sponte when the defendant is charged with mayhem.

*People v. Sekona, supra,* 27 Cal.App.4th 443, held that a trial court has no sua sponte duty to instruct on unreasonable self-defense in relation to a mayhem charge. (*Id.* at pp. 450, 457.) In a scholarly opinion, *Sekona* explained that no statute required, and no Supreme Court case had held, that an unreasonable belief in the need for self-defense negated mayhem's malice element. Because application of the imperfect self-defense doctrine to mayhem was not a general principle of law, a trial court had no sua sponte duty to instruct on it. (*Id.* at pp. 450-451.) Further, the California Supreme Court had not held such a sua sponte duty existed "in any context other than murder." (*Id.* at p. 451.) *People v. Flannel, supra,* 25 Cal.3d 668, considered only the " 'malice aforethought' " required for murder, not the " 'malice' " required for mayhem, which are legally distinct concepts. (*Sekona*, at pp. 452-453.) The concept of malice under section 7, subdivision 4

12

was distinguishable from the malice aforethought required for murder. (*Sekona*, at p. 453; *People v. Rodarte, supra,* 223 Cal.App.4th at p. 1169.) *Sekona* traced the development of the crime of mayhem under the English common law and California's statutory scheme, and concluded that unlike the crime of murder, "mayhem involves a different requisite mental state and has no statutory history recognizing a malice aforethought element or the availability of the *Flannel* defense." (*Sekona*, at p. 457.)

*People v. Hayes, supra,* 120 Cal.App.4th at page 801, similarly concluded the doctrine of imperfect self-defense "has no application to a charge of mayhem." The court explained: "We do not agree that a belief in the necessity for self-defense can negate an 'intent to vex, injure or annoy.' Such an intent lacks the crucial characteristic of 'malice aforethought' said in *Flannel* to justify the defense, i.e., awareness that one's conduct does not conform to the expectations of society." (*Id.* at p. 802.) "[M]alice aforethought reflects or embodies a realization by the actor that his or her conduct *violates social expectations*. It is this realization that cannot be reconciled with an actor's belief that he or she is acting in self-defense, because society approves the reasonable use of force to that end. [¶] This rationale cannot be extended to the more general concept of 'malice' as defined in section 7 and incorporated in the statutory definition of mayhem. That definition connotes no element of knowing violation of social norms. It requires only [an] intent to vex, injure, or annoy. A belief that one is acting in self-defense, whether reasonable or unreasonable, has no tendency to negate the element of malice. Indeed the intent to vex, injure, or annoy may be present when one acts in *reasonable* self-defense. Such a circumstance affords a defense not because it negates the element of malice but because it *excuses or justifies* the conduct in question despite the intent to injure." (*Id.* at p. 803, fn. omitted.) The court summed up: "[W]hereas 'malice aforethought' betokens a willingness to violate social standards of conduct, 'malice' under section 7, subdivision 4 requires only an intent to injure, vex, or annoy. One who believes his or her conduct is necessary for self-defense does not manifest a willingness to violate social norms, but may very well manifest a desire to injure. It follows that the *Flannel* defense has no application to a charge of mayhem." (*Id.* at p. 804.)

13

Other cases are in accord.  (See *People v. Quintero, supra,* 135 Cal.App.4th at p. 1167 [the *Sekona* and *Hayes* rationale that imperfect self-defense is inapplicable to the crime of mayhem also pertains to aggravated mayhem]; *People v. Szadziewicz, supra,* 161 Cal.App.4th at p. 836 ["Because the theory of unreasonable self-defense does not apply to a charge of aggravated mayhem, the trial court had no duty to instruct on that theory . . . either sua sponte or on request"].)

Several cases have likewise held an imperfect self-defense instruction need not be given sua sponte or is inapplicable to section 246 and similar crimes.  In *People v. Watie, supra,* 100 Cal.App.4th 866, as here, the defendant was charged with violation of section 246, among other offenses.  *Watie* rejected the contention that the trial court erred by failing to sua sponte instruct on imperfect self-defense:  "At the time of trial, as now, no authority suggests that the nondefense of imperfect, or unreasonable, self-defense could apply in a prosecution for violation of section 246.  Such a legal theory would be at odds with *Barton*'s characterization of unreasonable self-defense as a species of voluntary manslaughter." (*Watie*, at p. 882.)  Because no authority so held, application of unreasonable self-defense to a section 246 charge was not a general principle of law requiring sua sponte instruction.  (*Ibid.*)

In *People v. Vallejo, supra,* 214 Cal.App.4th 1033, the defendant was convicted of, inter alia, shooting from a motor vehicle (§ 26100, subd. (c), formerly § 12034, subd. (c)), which, like section 246, required proof the defendant acted maliciously. Relying on *Sekona* and *Hayes, Vallejo* rejected *McKelvy*'s analysis.  (*Vallejo,* at p. 1041.)

Most recently—and after the trial court's ruling in the instant matter—our colleagues in Division One held that a trial court did not err by failing to instruct on imperfect self-defense on a charge of shooting from a motor vehicle (§ 26100, subds. (c) & (d).)  (*People v. Rodarte, supra,* 223 Cal.App.4th at p. 1171.)  In *Rodarte,* as here, the defendant's request for an imperfect self-defense instruction was denied.  (*Id.* at p. 1167.) During deliberations the jury asked for clarification of the difference between perfect and imperfect self-defense, and the court advised that imperfect self-defense was inapplicable to the shooting from a motor vehicle counts.  (*Ibid*.)  *Rodarte* explained that the doctrine

14

of imperfect self-defense "is limited to the negation of the malice element of murder." (*Id.* at p. 1168.) The court reasoned: "The 'malice' required for mayhem as well as a section 26100, subdivision (c) offense is the 'wish to vex, annoy, or injure another person.' (§ 7, subd. 4.)" (*Rodarte*, at p. 1171.) Relying on *Vallejo*, *Rodarte* explained: "The unreasonable self-defense theory for murder is based on the principle that a person who believes in the need for self-defense 'lacks the crucial characteristic of "malice aforethought" [which is the] awareness that one's conduct does not conform to the expectations of society.' [Citation.] In contrast, the wish to 'vex, injure, or annoy' connotes a knowing violation of social norms, and is likely to be present even when one acts in reasonable self-defense. [Citation.] As a result, unreasonable self-defense simply has no application to the malicious discharge of a firearm from a motor vehicle. Because the jury was not asked to find defendant harbored 'malice aforethought' in his shooting from a motor vehicle, instruction with CALCRIM No. 604 [imperfect self-defense] would have been inappropriate. Shooting from a motor vehicle requires only the general concept of malice as defined in section 7; therefore, instruction [on] imperfect self-defense would have been inappropriate." (*Rodarte*, at p. 1171.)

Based on the foregoing, we conclude the trial court did not err by declining to instruct on imperfect self-defense. *Rodarte,* in particular, is on all fours with the instant matter. Although *Rodarte* involved section 26100, subdivision (c) (shooting from a motor vehicle) and the instant case involves section 246 (shooting at an occupied motor vehicle), the statutes contain the same language requiring that the defendant willfully and maliciously discharge a firearm. Indeed, the predecessor to section 26100, subdivision (c), section 12034, subdivision (c), was patterned after section 246.[11] (*People v. Licas, supra,* 41 Cal.4th at p. 368, fn. 2; see also *People v. Hernandez, supra*, 181 Cal.App.4th at p. 1500 [the crimes proscribed by section 246 and former section 12034 are

---

[11] Operative January 1, 2012, section 12034 was repealed and continued without substantive change as section 26100. (*People v. Rodarte, supra,* 223 Cal.App.4th at p. 1160, fn. 2.)

15

analogous].)  We agree with the analysis in *Rodarte* and the cases upon which it relied*,* and adopt their reasoning here.  Because the trial court did not misdirect the jury, its ruling granting the motion for a new trial was an abuse of discretion.**12**

**2.  The other grounds raised in Iraheta's new trial motion did not warrant the grant of a new trial.**

An order granting a new trial "will be affirmed on appeal without regard to the particular reason given if there is good and sufficient reason present which is within the terms of the motion." (*People v. Montgomery* (1976) 61 Cal.App.3d 718, 728; *People v. Richmond, supra,* 2 Cal.App.4th at p. 616.)  Iraheta contends that apart from the instructional issue addressed *ante*, his new trial motion should have been granted on several other grounds.  We address each contention seriatim.

A.  *Gang evidence*

(1)  *Additional facts*

(a)  *Iraheta's September and December 2002 contacts with police.*

City of Inglewood Police Officers John Baca and Neal Cochran testified regarding their observations of Iraheta on September 2, 2002.  In response to reports of a robbery and a man with a gun, the officers went to a location on Brett Street in Inglewood, within the territory claimed by the Inglewood 13 gang.  Baca observed three male Hispanics walking down the street.  One of them threw a gun under a parked car.  All three men

---

**12**　　Iraheta does not make a separate argument here regarding his request that the jury be instructed on mistake of fact.  As the People point out, had the jury concluded Iraheta actually and reasonably believed Orozco had a gun and was going to shoot him or his passengers, this scenario was adequately covered by the instructions given on perfect self-defense.  To the extent Iraheta sought an instruction stating that an *unreasonable* mistake of fact was a defense, such an instruction was in essence a restatement of the imperfect self-defense instruction, and was properly omitted for the reasons discussed *ante.*  (See *People v. Watie, supra,* 100 Cal.App.4th at p. 883; cf. *People v. Lawson* (2013) 215 Cal.App.4th 108, 115 [in order for the mistake of fact "defense" to apply, "[f]or general intent crimes, the defendant's mistaken belief must be both actual and reasonable"].)

16

were determined to be members of the Inglewood 13 gang. The officers also observed Iraheta, Tovar, and Christian Muniz seated in a brown Buick nearby. Tovar had told Cochran he was an Inglewood 13 gang member with the moniker "Little Drowsy." Cochran completed field identification (F.I.) cards on the three men in the Buick. He noted on Iraheta's card several indicia of gang membership, including his attire, affiliation with gang members, tattoo, and his presence in a gang area. Cochran testified that the "L.A." tattoo was used by the Inglewood 13 gang to demonstrate it was a Southern California gang allied with the Mexican Mafia. Iraheta and the occupants of the Buick were not arrested, because they had not committed any crime.

On December 2, 2002, Inglewood Police Officer Brett Birkbeck responded to a call regarding a man with a gun in Centinela Park in Inglewood. When he and his partner arrived, he observed approximately 10 male Hispanics, including Iraheta, fighting in the park. A gun was on the ground approximately 10 to 15 feet away from the fight. Several of the men fled upon the officers' arrival, but the officers interviewed the remaining combatants, including Iraheta. Birkbeck's partner filled out an F.I. card on Iraheta, noting several indicia of gang membership, including his tattoo, attire, affiliation with gang members, and presence in a gang area. Birkbeck observed Iraheta's "I" belt buckle. After speaking with the officers, none of the combatants were arrested.

(b) *Officer Barragan's testimony*

Inglewood Police Officer Jose Barragan, an expert on the Inglewood 13 gang, testified for the People, as follows. In 2002, the gang had approximately 500 members. It was associated with the Mexican Mafia. Reputation is enormously important to gangs. The gang subculture revolves around respect and status, which are gained through fear, intimidation, and violence directed at the community and rival gang members. Gang members are required to commit violent crimes such as shootings, assaults, grand thefts, carjackings, homicides, and stabbings. Committing such crimes is known as " 'putting in the work.' "

17

The Inglewood 13 gang claims the entire City of Inglewood as its territory, but gang members are most commonly found in an area bordered by Century Boulevard, Aviation Boulevard, Prairie Boulevard, and 64th Street. The Centinela Park was in the Inglewood 13's territory. The Jr. Market was in the center of the gang's claimed territory, and was a gang hangout. If a rival gang member enters another gang's territory, it is a sign of disrespect. If a gang member sees someone believed to be a rival in his own territory and does nothing, he will be considered weak and inferior. The Inglewood 13's gang's rivals included the Culver City Boys gang. A gang will retaliate when one of its members is shot at or killed by a rival gang.

Gang members commonly use monikers, or nicknames. Inglewood 13 gang members often wear "I" belt buckles similar or identical to Iraheta's. They typically have Inglewood 13 tattoos, and sometimes have "West L.A." tattoos.

Barragan reviewed "screen shots" of contacts listed in Iraheta's cellular telephone. Approximately half of Iraheta's contacts appeared to be listed by moniker. Barragan compared the monikers and telephone numbers in Iraheta's telephone with monikers and telephone numbers found on F.I. cards maintained by the Inglewood Police Department, and concluded that 12 of Iraheta's contacts were Inglewood 13 gang members.

Barragan also determined, through his examination of F.I. cards, that four persons involved in the fighting at Centinela Park were self-admitted Inglewood 13 gang members.

Barragan had not discovered information suggesting Martinez was a Culver City Boys gang member. One of the Culver City Boys gang's colors is red.

Barragan testified that, in his opinion, Iraheta was an Inglewood 13 gang member at the time of the shooting. His opinion was based on the facts of the charged crime; Iraheta's "West L.A." tattoo and "I" belt buckle; the fact his telephone listed 12 Inglewood 13 gang members as contacts; and his association with Inglewood 13 gang members during the September and December 2002 incidents, as related by the other officers and memorialized in the F.I. cards and police reports. Barragan did not know of any Inglewood 13 gang member who fit the following criteria: was in the military,

18

enrolled in school, had a job, lacked Inglewood 13 gang tattoos, and had never admitted gang membership to an officer.

When given a hypothetical based on the facts of the case, Barragan opined that such a shooting would be committed for a gang-related motive.

### (c) *Iraheta's testimony*

Iraheta denied being a gang member. He explained that he was at Centinela Park in December 2002 to pick up Maciel's younger brother, at the request of Maciel's mother, and he did not participate in the fighting. He was not involved in gang activity when officers stopped him in September 2002. His phone contacts were not gang members, but members of a roller hockey league and friends from the military.

### (2) *The trial court did not abuse its discretion by admitting gang evidence.*

Iraheta moved in limine to exclude the evidence of his September and December 2002 contacts with police, including the two F.I. cards officers completed on him. Additionally, he objected on hearsay and confrontation clause grounds at certain points during Officer Barragan's testimony. The motion was denied and his objections were overruled.

Iraheta contends a new trial should have been granted because the admission of the gang evidence violated his rights to due process and a fair trial.[13] Relying on *People v. Albarran* (2007) 149 Cal.App.4th 214, he urges that the gang evidence was irrelevant because there was an insufficient showing the shooting was gang-related, and prejudicial because it was highly inflammatory.[14] We disagree.

---

[13] The trial court did not grant the motion on this ground. After the court granted Iraheta a new trial, the prosecutor sought the court's input on the additional issues raised in the motion to save time in the future. The trial court stated that, "off the cuff, I can say that I think motive, gang issue for motive was allowable."

[14] Relying on statements purportedly made to trial counsel by jurors after the verdict, Iraheta argues that the evidence was prejudicial because it convinced jurors he was a gang member. Trial counsel reported these statements in a declaration interspersed

Only relevant evidence is admissible. (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210; *People v. Lee* (2011) 51 Cal.4th 620, 642; *People v. Mills* (2010) 48 Cal.4th 158, 193.) Even relevant evidence may be excluded in the trial court's discretion if its probative value is substantially outweighed by the probability that its admission will create a substantial danger of undue prejudice. (*Lee*, at p. 643.) A trial court has broad discretion in determining whether evidence is relevant and whether Evidence Code section 352 precludes its admission. (*Mills*, at p. 195; *People v. Williams* (2008) 43 Cal.4th 584, 634.) Rulings regarding relevancy and Evidence Code section 352 are reviewed under the abuse of discretion standard. (*Lee*, at p. 643; *People v. Hamilton* (2009) 45 Cal.4th 863, 929-930.)

Gang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative. (*People v. Carter* (2003) 30 Cal.4th 1166, 1194; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167; *People v. Albarran, supra,* 149 Cal.App.4th at p. 223; *People v. Avitia* (2005) 127 Cal.App.4th 185, 192-193.) "Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)

---

throughout Iraheta's new trial motion. They are therefore inadmissible hearsay. (Evid. Code, § 1200; cf. *People v. Hayes* (1999) 21 Cal.4th 1211, 1256.) Furthermore, a verdict may not be impeached by evidence of jurors' thought processes. (Evid. Code, § 1150, subd. (a).) Accordingly, we do not consider the statements reportedly made by the jurors.

20

Gang evidence is inadmissible if introduced only to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense. (*People v. Avitia*, *supra*, 127 Cal.App.4th at p. 192; *People v. Albarran, supra,* 149 Cal.App.4th at p. 223.) Evidence of gang membership "is potentially prejudicial and should not be admitted if its probative value is minimal. [Citation.]" (*People v. Hernandez, supra,* 33 Cal.4th at p. 1049; see generally *People v. Bojorquez* (2002) 104 Cal.App.4th 335, 345.)

The trial court did not abuse its discretion by admitting evidence regarding Iraheta's gang membership, and the culture, territory, and activities of the Inglewood 13 gang. Evidence Iraheta was a member of the Inglewood 13 gang tended to establish a motive for the shooting. The People's theory was that Martinez either was, or could have been mistaken for, a Culver City Boys gang member; he "disrespected" the Inglewood 13 gang by appearing in the heart of Inglewood 13 territory, at a store frequented by Inglewood 13 gang members; and Iraheta shot at Martinez's car in an effort to protect the gang's territory and earn or keep the gang's "respect." The evidence admitted was relevant to prove this theory, and explain the motive for the crime. " ' "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." [Citations.]' " (*People v. Samaniego, supra,* 172 Cal.App.4th at p. 1168.) Whether a gang member would earn "respect" by such a shooting is sufficiently beyond common experience that expert testimony was probative and necessary to the jury's understanding of the case. (Cf. *People v. Gonzalez* (2006) 38 Cal.4th 932, 945; *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1551; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1384 ["It is difficult to imagine a clearer need for expert explication than that presented by a subculture in which this type of mindless retaliation promotes 'respect' "].) California courts routinely admit gang evidence "when the very reason for the crime, usually murder, is gang related. [Citations.]" (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449.) Such was the situation here.

21

*People v. Williams* (1997) 16 Cal.4th 153, is instructive. The prosecution's theory in *Williams* was that the victim looked like a Crip, was in an area claimed by Crips and Bloods, and was shot by a Blood for at least appearing to be a Crip. Evidence that the defendant was a Blood gang member who had led a gang meeting where killing Crips was discussed, as well as evidence of gang colors and behavior, all tended to prove that the defendant had a motive for killing, and may have shot the victim. (*Id*. at p. 194.) *Williams* therefore held that the evidence had more than minimal probative value, and the trial court did not err by admitting it. (*Id*. at pp. 193-194.)

Iraheta cites *People v. Albarran, supra,* 149 Cal.App.4th 214, in support of his argument that the evidence should have been excluded. In *Albarran,* the defendant, a member of the 13 Kings gang, shot at a house where Michael Bacelis was hosting a birthday party. Bacelis was a member of a different gang, but there was no evidence the two gangs were rivals. (*Id.* at pp. 217, 221.) A gang expert testified that the shooting occurred in the 13 Kings' territory, and the defendant would have gained respect by committing it. (*Id.* at p. 220.) Even though the shooters had not identified their gang when committing the offense, the "word on the street" was that Los Compadres gang members had been at the party, and the party attendees would have known who was present and would also know the shooters. (*Id.* at p. 221.) The expert further testified that Albarran had a tattoo referencing the Mexican Mafia; described in detail Albarran's gang involvement, including that he and his brother had been jumped in to the gang; related that he had had 20 contacts with Albarran in the preceding two years; identified other 13 Kings gang members by name and moniker, and described arresting them; stated that the 13 Kings gang had committed numerous criminal offenses; and noted that graffiti attributed to the gang contained a specific threat to murder police officers. (*Id.* at pp. 220-221.)

After a jury found Albarran guilty, the trial court held there was insufficient evidence to support the true findings on the gang-enhancement allegations and granted Albarran's new trial motion on that issue. In a divided opinion, *Albarran* found that the trial court should have granted the motion as to the underlying charges as well as to the

gang allegations, because admission of the gang evidence rendered the trial fundamentally unfair. (*People v. Albarran, supra,* 149 Cal.App.4th at pp. 227-232.) The majority reasoned that "there was insufficient evidence to support the contention that [the] shooting was done with the intent to gain respect"; instead, the motive for the crimes was not apparent from the circumstances. (*Id.* at p. 227.) Although the expert testified that gang members commit crimes to gain respect, there was no showing the shooters announced their presence or purpose before, during, or after the shooting. (*Ibid.*) Moreover, other evidence—in particular the identities of the other gang members, the types of crimes they had committed, the graffiti threat, and the references to the Mexican Mafia—was irrelevant and highly inflammatory. (*Id.* at pp. 227-230.)

Admittedly, there are some factual similarities between *Albarran* and the instant matter. As in *Albarran,* Iraheta did not call out a gang name or throw gang signs when he committed the shooting. However, the differences are significant and compel a different result. Unlike in *Albarran,* the gang evidence was not here used to create a motive not otherwise suggested by the evidence. The evidence showed that Martinez—who was wearing red, the color of a rival gang—stopped at a store in the heart of Inglewood 13 territory, where he was "mad-dogged" by Tovar, an Inglewood 13 gang member. When Martinez passed by the market later that night in the same car, Tovar was there, talking to Iraheta. Tovar pointed to Martinez's Honda. Iraheta then followed Martinez to 65th Street in his Camaro, where Martinez had already alighted from his Honda, waiting to confront the Camaro's occupants. Unlike in *Albarran,* where the motive for the shooting was admittedly unknown, this evidence suggested the shooting was motivated by Martinez's visit to the gang's territory.

Moreover, in *Albarran,* the court pointed out that evidence of Albarran's gang involvement, standing alone, was sufficient proof of gang motive. (*People v. Albarran, supra,* 149 Cal.App.4th at p. 228.) Here, the evidence regarding the identities of other gang members and Iraheta's tattoo were not simply extraneous, but were necessary to establish that Iraheta was, in fact, an Inglewood 13 gang member, a circumstance he denied. Thus, testimony regarding the other gang members' presence at the September

23

and December 2002 encounters with police, as well as that regarding the contacts in Iraheta's phone, was necessary to establish he was a gang member. The defense theory was that Iraheta's tattoo was not related to a gang, but reflected the fact he was raised in Santa Monica. Testimony that the Inglewood 13 gang was allied with the Mexican Mafia, and that Iraheta's tattoo likewise indicated such an allegiance, was therefore relevant to show the tattoo was, in fact, gang-related. On this record, we cannot say the probative value of the challenged gang evidence was minimal. (See *People v. Williams, supra,* 16 Cal.4th at p. 194.)

Additionally, the trial court provided a limiting instruction to jurors, stating that the gang evidence could be used only to determine whether Iraheta had a motive for the shooting. We presume jurors follow the court's instructions. (*People v. Waidla* (2000) 22 Cal.4th 690, 725; *People v. Williams* (2000) 79 Cal.App.4th 1157, 1171.) This instruction mitigated any potential prejudice.

(3) *Admission of the gang evidence did not violate the Confrontation Clause.*

Iraheta next urges that his Confrontation Clause rights were violated because the gang expert and other police officer witnesses related testimonial hearsay. (*Crawford v. Washington* (2004) 541 U.S. 36.) In his opposition brief, Iraheta cursorily challenges testimony in which officers Daniel Milchovich and Kerry Tripp testified that persons other than Iraheta were "self-admitted" members of the Inglewood 13 gang. Officer Milchovich testified that he spoke with Tovar in January 2002. He asked Tovar whether he was an Inglewood 13 gang member, and Tovar said yes. Tovar stated his moniker was "Lil Drowsy." He was wearing an "I" belt buckle. Milchovich completed an F.I. card reflecting these facts. Milchovich encountered Raul Guillen in August 2002, and completed a similar F.I. card on him. Guillen told Milchovich he went by the moniker "Lil Crazy." Milchovich saw an "ING" tattoo on Guillen's left arm. He categorized Guillen as an Inglewood 13 gang member based on his self-admission, his associates, and his tattoos. Officer Tripp similarly testified that he had spoken to Christian Muniz, Ramon Rodriguez, Giovanni Arias, Martin Fuentes, and Omar Gomez and filled out F.I.

24

cards on them. Each had admitted being an Inglewood 13 gang member, and each had other indicia of gang membership such as tattoos, gang attire, frequenting a gang area, or associating with Inglewood 13 gang members. In his new trial motion, Iraheta additionally challenged "other gang incidents and behavior that involved testimonial hearsay," but did not further identify particular portions of the officers' testimony.

The People urge that Iraheta has forfeited his challenges to at least some of the officers' testimony because he failed to object on confrontation grounds below. They also aver that *Crawford* does not undermine the established rule that an expert may rely on hearsay in forming his or her opinion, and may testify at trial regarding the bases for those opinions. Moreover, they contend no confrontation violation occurred because the officers did not rely on or relate testimonial hearsay.

Apart from the question of forfeiture, we discern no constitutional violation. The Sixth Amendment to the United States Constitution gives a criminal defendant the right to confront and cross-examine adverse witnesses. (*People v. Lopez* (2012) 55 Cal.4th 569, 573, 576.) In the seminal case of *Crawford v. Washington, supra*, 541 U.S. 36, the court overruled its prior precedent and held that the Sixth Amendment generally bars admission at trial of a testimonial out-of-court statement offered for its truth against a criminal defendant, unless the maker of the statement is unavailable to testify and the defendant had a prior opportunity for cross-examination. (*Id*. at p. 59; *Davis v. Washington* (2006) 547 U.S. 813, 821; *Lopez*, at p. 576.) Although *Crawford* set forth a new standard for admissibility, the court declined to provide a comprehensive definition of "testimonial." (*Crawford*, at p. 68; *People v. Cage* (2007) 40 Cal.4th 965, 969; *People v. Hill* (2011) 191 Cal.App.4th 1104, 1134.) *Crawford* did make clear that the Confrontation Clause does not bar out-of-court statements not offered for their truth. (*Crawford*, at p. 60, fn. 9; *People v. Valadez* (2013) 220 Cal.App.4th 16, 30 (*Valadez*); *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1210.)

It has long been the law in California that gang experts may rely on reliable hearsay in forming their opinions, and testify regarding the basis for their opinions, even if the evidence would otherwise be inadmissible. (Evid. Code, §§ 801, subd. (b), 802;

25

*People v. Gardeley* (1996) 14 Cal.4th 605, 617-618.) California appellate courts after *Crawford* repeatedly have held that the admission of testimonial out-of-court statements or other hearsay evidence offered as the basis for an expert's opinion does not violate *Crawford*, because they are not offered for their truth. (See *Valadez, supra*, 220 Cal.App.4th at p. 30 [listing cases]; *People v. Thomas, supra*, 130 Cal.App.4th at pp. 1209-1210; *People v. Ramirez* (2007) 153 Cal.App.4th 1422, 1426-1427; *People v. Sisneros* (2009) 174 Cal.App.4th 142, 153.)

An analysis of the plurality, concurring, and dissenting opinions in the United States Supreme Court's decision in *Williams v. Illinois* (2012) 132 S.Ct. 2221 and the California Supreme Court's decision in *People v. Dungo* (2012) 55 Cal.4th 608 casts doubt on whether this principle is still good law.[15] Based on *Williams* and *Dungo*, it appears that, at least when scientific or forensic expert testimony is at issue, "a majority of justices on both the United States Supreme Court and our high court have indicated expert basis evidence is offered for its truth and subject to the [C]onfrontation [C]lause." (*Valadez, supra*, 220 Cal.App.4th at p. 31; see *People v. Mercado* (2013) 216 Cal.App.4th 67, 89 & fn. 6.)

However, we need not address this question because most, if not all, of the hearsay relied upon by the officers was nontestimonial. *Crawford* only excludes testimonial hearsay. (*People v. Cage, supra,* 40 Cal.4th at p. 981.) An out-of-court statement is testimonial only if its primary purpose pertains to a criminal prosecution, and if it was made with a degree of formality or solemnity. (*People v. Lopez, supra*, 55 Cal.4th at pp. 581-582; *People v. Mercado, supra*, 216 Cal.App.4th 87; *People v. Barba* (2013) 215 Cal.App.4th 712, 720-721.) Here, nothing in the record suggests that the circumstances surrounding the officers' conversations with the gang members were sufficiently formal

---

[15] Our Supreme Court is currently considering whether a defendant's confrontation rights are violated by a gang expert's reliance on testimonial hearsay. (*People v. Sanchez* (2014) 223 Cal.App.4th 1, review granted May 14, 2014, S216681; *People v. Archuleta* (2014) 225 Cal.App.4th 527, review granted June 11, 2014, S218640.)

26

that the statements were analogous to testimony. (*People v. Hill, supra,* 191 Cal.App.4th at pp. 1135-1136; *Valadez, supra,* 220 Cal.App.4th at pp. 35-36.) Further, nothing in the record suggests the officers' purpose in speaking with the gang members was to develop information regarding the instant crimes. (*Hill,* at pp. 1135-1136; *Valadez,* at pp. 35-36.) The fact officers prepared F.I. cards concerning the conversations did not render the statements testimonial. (*Hill,* at pp. 1135-1136.) The same is true with regard to Officer Barragan's testimony. In short, the conversations "lacked any indicia of testimony and, under *Crawford* and *Davis,*" were not testimonial. (*Hill,* at p. 1136.) Moreover, the officers did not testify that they believed the persons they spoke with were gang members solely because they self-identified. Without exception, their opinions were also based on nonhearsay, such as attire, association with other gang members, and tattoos. There was no Confrontation Clause violation, and therefore no basis for a new trial on this ground.

B. *Admission of evidence regarding the 2004 shooting of Martinez's car*

    (1) *Additional facts*

Martinez testified for the People in Iraheta's first trial in 2003. Over a defense objection, the prosecutor was allowed to elicit that approximately a year later, Martinez was visiting a friend when he heard gunshots. He went outside and discovered that his Honda had been shot. He moved out of California because he thought his life was in danger. Defense counsel argued that the testimony was prejudicial and irrelevant because there was no showing Iraheta was responsible for the shooting. The trial court allowed the evidence because it was relevant to motive and Martinez's state of mind while testifying.

Iraheta subsequently moved for a mistrial on the grounds the testimony was unduly prejudicial.[16] The trial court expressed concern that the evidence actually elicited did not correspond to the prosecutor's offer of proof, in that Martinez did not testify he

---

[16]    Iraheta also complained that the late disclosure of the incident was a discovery violation. He does not advance this argument in his opposition to the People's opening brief, and we do not consider it.

believed the shooting of his car was carried out by the Inglewood 13 gang. Had the court known the testimony merely evidenced "a shooting a year later in the same neighborhood," it would have excluded the evidence under Evidence Code section 352. However, Martinez's testimony did not show Iraheta had anything to do with the 2004 shooting. Therefore, the court denied the mistrial motion because admission of the evidence was harmless.

Subsequently, the court informed the jury that the parties had stipulated that Iraheta had "nothing to do with" the 2004 shooting, and the evidence was admissible only to show Martinez's state of mind.[17]

Admission of evidence of the shooting was not a basis for the grant of the new trial, and the court did not expressly rule on the issue. However, after the court granted the new trial motion, the prosecutor inquired about the court's thoughts on the other issues raised in the motion. The court stated that it likely would exclude the evidence under Evidence Code section 352 if it had to revisit the ruling. The court did not suggest admission of the evidence was prejudicial.

### (2) *Discussion*

Iraheta contends that the evidence was inadmissible propensity evidence. He avers that, although there was no showing he was responsible for the 2004 shooting, the evidence improperly allowed the jury to infer that he, or his agent, shot at Martinez's car to retaliate against or "quiet" him.

---

[17] The court admonished the jury: "First of all, Mr. Iraheta did not do that shooting. Absolutely did not. He couldn't have possibly done it beyond a shadow of a doubt. [¶] The facts were that Mr. Noe Martinez was at Fabian's house. Martinez's car was parked out in front. Somebody shot at his car, not at Mr. Martinez. And Mr. Martinez filed a police report. [¶] . . . [I]t was the car that was shot at, not Mr. Martinez. And Mr. Iraheta had nothing to do with it. [¶] So that came in just to show Mr. Martinez's state of mind for . . . however it might have affected his coming to court and testifying. But it had nothing to do with Mr. Iraheta." The prosecutor and defense counsel both stipulated to the court's remarks.

Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to his or her credibility and is therefore admissible. An explanation of the basis for the witness's fear is likewise relevant to his or her credibility and admission of such evidence lies within the court's discretion. (*People v. Burgener* (2003) 29 Cal.4th 833, 869; *People v. Sapp* (2003) 31 Cal.4th 240, 281, 301; *People v. Gutierrez* (1994) 23 Cal.App.4th 1576, 1587-1588; see generally Evid. Code, § 780.) " 'It is not necessary to show threats against the witness were made by the defendant personally, or the witness's fear of retaliation is directly linked to the defendant for the evidence to be admissible.' [Citation.]" (*Sapp*, at p. 281; *Burgener*, at pp. 869-870; *Gutierrez*, at pp. 1587-1588; *People v. Olguin, supra,* 31 Cal.App.4th at p. 1368.) "A witness who testifies despite fear of recrimination of *any* kind by *anyone* is more credible because of his or her personal stake in the testimony. Just as the fact a witness expects to receive something in exchange for testimony may be considered in evaluating his or her credibility [citation], the fact a witness is testifying despite fear of recrimination is important to fully evaluating his or her credibility." (*Olguin*, at pp. 1368-1369.)

Here, the trial court clearly informed the jury that the parties had stipulated Iraheta was not responsible for the shooting. Therefore, the evidence could not have amounted to evidence of Iraheta's character or propensity to commit the shooting. The trial court did not abuse its discretion by admitting the evidence.

Even assuming error, Iraheta has not demonstrated prejudice. The erroneous admission of evidence requires reversal only if it is reasonably probable that the defendant would have obtained a more favorable result had the evidence been excluded. (Evid. Code, § 353, subd. (b); *People v. Earp* (1999) 20 Cal.4th 826, 878; *People v. Avitia, supra,* 127 Cal.App.4th at p. 194.) The admission of relevant evidence will not offend due process unless it is so prejudicial as to render the defendant's trial fundamentally unfair. (*People v. Hamilton, supra,* 45 Cal.4th at p. 930; *People v. Partida* (2005) 37 Cal.4th 428, 439.) Here, any possible prejudice to Iraheta was dispelled by the parties' stipulation that the shooting "had nothing to do with Mr. Iraheta," who "couldn't

have possibly done it beyond a shadow of a doubt."[18]  Admission of evidence therefore did not warrant a new trial.

C. *Admission of Iraheta's convictions for impeachment.*

After committing the instant crime, Iraheta was twice convicted of assault while in prison (§§ 245, 4500.)  The defense moved to exclude evidence of these convictions.  The trial court allowed the prosecutor to impeach Iraheta with the convictions, but prohibited him from disclosing the nature of the crimes.  Instead, the prosecutor was ordered to refer to the offenses only as crimes involving moral turpitude.  In line with the court's ruling, the prosecutor elicited the evidence as follows:

"[The prosecutor]:  Mr. Iraheta, is it true that on November 21st of the year 2008 you were convicted of a felony, a crime involving moral turpitude?

"[Iraheta]:  Yes.

"[The prosecutor]:  And is it also true that on June 28 of [the] year 2007 you were . . . convicted of a felony, a crime involving moral turpitude?

"[Iraheta]:  Yes."

Iraheta contends his new trial motion should have been granted on the ground that admission of his 2007 and 2008 convictions was prejudicial error.  He avers that the trial court abused its discretion by allowing Iraheta to be impeached with "convictions that occurred while he was in prison due to what this Court later determined was an unlawful conviction."  He suggests evidence of the convictions was more prejudicial than probative, and "only caused the jury to believe that he was a person who could not even behave in prison and was thus more likely to have harbored felonious intent at the time of the shooting."  We disagree.

---

[18]  Again relying on statements purportedly made to trial counsel by jurors after the verdict, Iraheta argues that the prejudice inherent in the evidence was not dispelled by the stipulation.  As noted *ante,* trial counsel's statements about what jurors told her after the verdict are inadmissible hearsay (Evid. Code, § 1200; cf. *People v. Hayes, supra,* 21 Cal.4th at p. 1256) and inadmissible to impeach the verdict (Evid. Code, § 1150, subd. (a)).  Accordingly, we do not consider them.

It is well settled that, subject to the court's exercise of discretion under Evidence Code section 352, a witness may be impeached with any prior conduct involving moral turpitude[19] whether or not it resulted in a felony conviction. (*People v. Clark* (2011) 52 Cal.4th 856, 931; Evid. Code, § 788 [allowing impeachment with felony convictions].) " '[T]he admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude. Beyond this, the latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad.' " (*Clark*, at p. 931.) Here, the trial court appropriately acted to mitigate any prejudice arising from the evidence by "sanitizing" the convictions and allowing them to be referenced only as crimes of moral turpitude.

We disagree that the jury would have necessarily concluded Iraheta suffered the convictions in prison; that fact was not elicited at trial. The circumstance that the convictions occurred subsequent to the charged crime is of no moment. "The admission of a felony conviction for impeachment tests the defendant's credibility as a witness during trial. Whether the offense predated the charged crime has no bearing on its relevance to that issue." (*People v. Hinton* (2006) 37 Cal.4th 839, 887.) Therefore, "a prior felony conviction for purposes of impeachment under Evidence Code section 788 means any conviction suffered before trial, regardless of the offense date." (*Hinton*, at p. 887.) Accordingly, Iraheta's contention, made in his new trial motion below, that the convictions do not accurately reflect his character at the time of the shooting lacks merit. Iraheta cited no authority for the proposition that convictions of crimes suffered while awaiting retrial are exempt from these rules, and we are aware of none. His argument below, that a conviction suffered in prison "should not be viewed as the moral equivalent [of] the same crime committed in a normal living environment," might have resonated with the jury, but does not establish exclusion was required under Evidence Code section

---

[19]     Iraheta's opposition brief does not challenge the trial court's conclusion that the convictions were for crimes involving moral turpitude, and we do not consider the point.

352.[20]  The trial court did not abuse its discretion by allowing Iraheta to be impeached with the 2007 and 2008 convictions.

    D.  *There was no Doyle error.*

        (1)  *Additional facts*

Prior to trial, defense counsel informed the court that Iraheta had asserted his Fifth Amendment rights after being given *Miranda* advisements.[21]  Defense counsel had filed a motion to ensure the prosecutor would not attempt to use Iraheta's silence against him. The prosecutor stated he did "not intend to bring in any kind of invocation of his right."

The prosecutor conducted the following cross-examination of Iraheta regarding the shooting:

"[The prosecutor]:  And you say that after you shot Mr. Orozco, it took you two or three seconds to get to park, make a left.  And then how many seconds to get to that stop sign?

"[Iraheta]:  Maybe another three seconds.

"[The prosecutor]:  So six seconds have gone by?

 "[Iraheta]:  Because that street is also narrow so I had to be careful.  And plus, there's a little slight turn.  You could lose control and just run into something.

"[The prosecutor]:  And then yesterday, *for the first time you said* that you saw Noe Martinez go to—in the area of that Bronco?  [¶] *That was the first time you've ever said anything about that; correct*?

"[Defense counsel]:  Objection.  Assumes he was asked during the last proceeding.

"[The Court]:  Correct.  Sustained."  (Italics added.)

---

[20]    Iraheta argued in his new trial motion that Hispanic inmates in prison are subject to the control of the Mexican Mafia, and if he had refused orders to assault other inmates, he would have been targeted for attack.

[21]    *Miranda v. Arizona* (1996) 384 U.S. 436.

Subsequently, defense counsel complained that the italicized portions of the prosecutor's question constituted *Doyle* error,[22] in that the prosecutor implied Iraheta had "never told the police." Defense counsel acknowledged that the court had sustained her objection, but "the question was already out there." The trial court opined that the question could have referenced statements to a third party, not just the police. The prosecutor stated he had been attempting to impeach Iraheta with prior testimony, not with his invocation of his right to silence.

During argument, the prosecutor discussed the taped police interview of Alexis Moreno and replayed excerpts for the jury. The prosecutor argued that Moreno's statement was important for "not only what's in it, but what's not in it. Is there any mention at all whatsoever about anybody saying anything about a weapon? About the car, the Honda, the victim car blocking the street? Absolutely not." The prosecutor then pointed out that Moreno never denied Iraheta had followed Martinez's Honda, and never said anyone other than Iraheta had a gun. The prosecutor continued: "Now, I'm going to play this for you now, which is the third excerpt [from the Moreno interview] . . . . And the reason I'm playing this is because you would think *that if the defense version of what happened*—which is very different—not arguably, it is very different than what was said back in 2002, that if it had gone down the way it did—you heard in opening statement about an ambush. You know, the Bronco is now involved. We've got two people in there. We have Noe Martinez. Culver City 13 gang member because he wears red. Michael Orozco, not sure. Didn't hear any evidence about him and Culver City, but I'm sure that's going to be the inference because they hang out together—don't you think people would be saying something after you get away, like, 'thank you. God, that was close. Carlos you saved us. What a hero.' Instead this is what Alexis said." (Italics added.) The prosecutor then played a portion of the recorded interview of Moreno.

---

[22]    *Doyle v. Ohio* (1976) 426 U.S. 610.

The trial court's grant of Iraheta's new trial motion was not based on his assertion of *Doyle* error. To the contrary, when the trial court responded to the prosecutor's request for additional insight into the other grounds raised in the motion, the court opined that in its view, the prosecutor had not committed *Doyle* error. The argument that the cross-examination or argument constituted a comment on Iraheta's post-arrest silence "would have gone way over the jury's head."

### (2) *Discussion*

"Under *Doyle v. Ohio* (1976) 426 U.S. 610, 619, the use against defendant of a postarrest invocation of rights following a *Miranda* admonition violates due process. [Citation.] The *Doyle* rule is not violated when ' "the evidence of defendant's invocation of the right to counsel was received without objection and the remarks of the prosecutor did not invite the jury to draw any adverse inference from either the *fact* or the *timing* of defendant's exercise of his constitutional right." ' [Citation.] Moreover, a '. . . *Doyle* violation does not occur unless the prosecutor is *permitted* to use a defendant's postarrest silence against him at trial . . . .' [Citation.]" (*People v. Thomas* (2012) 54 Cal.4th 908, 936; *Greer v. Miller* (1987) 483 U.S. 756, 764-765; *People v. Clark, supra,* 52 Cal.4th at p. 959; *People v. Evans* (1994) 25 Cal.App.4th 358, 368; *People v. Champion* (2005) 134 Cal.App.4th 1440, 1448.) Such "permission" will usually "take the form of overruling a defense objection, thus conveying to the jury the unmistakable impression that what the prosecution is doing is legitimate." (*Evans*, at p. 368; *Champion,* at p. 1448.) To assess whether *Doyle* error occurred, we consider the context of the prosecutor's inquiry or argument. (*Champion*, at p. 1448.)

Iraheta argues that the prosecutor's cross-examination was an improper comment on his post-arrest silence, and the prosecutor's argument falsely implied he had given a different account of events to police the night of the shooting. We disagree. No *Doyle* error occurred. In context, jurors were unlikely to have interpreted the prosecutor's questions as a reference to Iraheta's post-arrest silence. As the People point out, jurors were far more likely to understand the prosecutor's questions as a reference to Iraheta's prior testimony. In any event, the trial court sustained defense counsel's objection to the

question. Therefore, the prosecutor was not permitted to use Iraheta's post-arrest silence against him, and no *Doyle* error occurred. (See *People v. Tate* (2010) 49 Cal.4th 635, 692 ["[i]f incipient *Doyle* misconduct lurked in this question, it was thus nipped in the bud" when the court sustained a defense objection]; *People v. Champion, supra,* 134 Cal.App.4th at p. 1448.)

Nor is the challenged portion of the prosecutor's argument susceptible to the interpretation Iraheta urges. The cited section was entirely addressed to *Moreno*'s statements to police, not Iraheta's. No reasonable juror would have understood the reference to the "defense version" of the case to mean Iraheta had told a different story the night of the crime. Rather, jurors were far more likely to understand the phrase to reference the overall defense theory of the case, an argument that was not improper. Because no *Doyle* error is apparent, the new trial motion could not properly have been granted on this ground.

### E. *Instruction with CALCRIM No. 371*

Over a defense objection, the trial court instructed the jury with CALCRIM No. 371, "Consciousness of Guilt: Suppression and Fabrication of Evidence." Defense counsel complained that there was no substantial evidence supporting the instruction. The prosecutor argued the jury could find Iraheta attempted to hide the gun by giving it to Maciel to place under the passenger seat. The trial court opined: "If you want to argue that, you can argue that. [The] [j]ury is never going to buy it. But I'll give it, because arguably there's facts." Accordingly, the trial court instructed the jury with CALCRIM No. 371, as follows: "If the defendant tried to hide evidence, that conduct may show that . . . he was aware of . . . his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself." In his motion for new trial, Iraheta argued this was prejudicial error. The trial court did not rule on this aspect of the motion.

The evidence that Iraheta attempted to hide evidence was, as the trial court observed, somewhat scanty. However, we cannot say as a matter of law that it was insufficient to support the instruction. In any event, assuming CALCRIM No. 371 was

35

given in error, Iraheta has not identified, either here or in his motion below, any potential prejudice arising from its use.  Similar consciousness-of-guilt instructions have been upheld against constitutional challenges.  (See, e.g., *People v. Famalaro* (2011) 52 Cal.4th 1, 35-36 [consciousness-of-guilt instruction did not violate the defendant's rights to due process, a fair jury trial, or a reliable jury determination of guilt]; *People v. Jurado* (2006) 38 Cal.4th 72, 125; *People v. Avila* (2009) 46 Cal.4th 680, 709.)  CALCRIM No. 371 did not assume or suggest Iraheta attempted to hide evidence, but left that factual question up to the jury.  (See *People v. San Nicolas* (2004) 34 Cal.4th 614, 667 [consciousness of guilt instruction did not " 'direct or compel the drawing of impermissible inferences in regard thereto' "]; cf. *People v. Carter* (2005) 36 Cal.4th 1114, 1182-1183; *People v. Richardson* (2008) 43 Cal.4th 959, 1020.)  This was reinforced by the court's explanation that some instructions might not apply, and that inclusion of a particular instruction was not meant to suggest "anything about the facts." (CALCRIM No. 200.)  Further, the cautionary nature of the instruction generally benefits the defense, admonishing the jury to circumspection regarding evidence that might be considered inculpatory.  (See *People v. Page* (2008) 44 Cal.4th 1, 50; *People v. Boyette* (2002) 29 Cal.4th 381, 438-439; *People v. Henderson* (2003) 110 Cal.App.4th 737, 742.)  Thus, even if given in error, inclusion of the instruction was manifestly harmless.  (See *People v. Pride* (1992) 3 Cal.4th 195, 248-249 ["at worst, there was no evidence to support the instruction and . . . it was superfluous"].)  Use of CALCRIM No. 371 therefore was not prejudicial error, and did not support the grant of the new trial motion.

> F.  *Cumulative error*

Iraheta contends that the cumulative effect of the purported errors deprived him of a fair trial.  As we have " 'either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial,' " we reach the same conclusion with respect to the cumulative effect of any purported errors.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1235-1236; *People v. Butler* (2009) 46 Cal.4th 847, 885.)

36

### 3. *Iraheta's motion in arrest of judgment*

In addition to his motion for a new trial, after the jury's verdict Iraheta made a motion in arrest of judgment, seeking to arrest the judgment on count 2, shooting at an occupied motor vehicle (§ 246), on the grounds that (1) the statute of limitations barred the section 246 charge, and (2) amendment of the information to add the section 246 charge after his successful appeal amounted to vindictive prosecution. He avers that this motion should have been granted.

However, as Iraheta candidly points out, the trial court did not rule on this motion. Therefore, "[b]ecause no ruling was actually made below, 'no review can be conducted here.' [Citations.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 827; see also *People v. Rowland* (1992) 4 Cal.4th 238, 259; *People v. Lewis* (2001) 26 Cal.4th 334, 375-376 [" '[T]he absence of an adverse ruling precludes any appellate challenge' "].) Accordingly, we do not address Iraheta's arguments regarding his motion in arrest of judgment at this juncture.

## DISPOSITION

The trial court's order granting a new trial is reversed.  The matter is remanded to the trial court with instructions to reinstate the verdict rendered by the jury and to impose sentence accordingly.

**CERTIFIED FOR PARTIAL PUBLICATION**

ALDRICH, J.

We concur:

KLEIN, P. J.

CROSKEY, J.

38